# JAMES McINTYRE *v.* STATE OF MARYLAND

[No. 538, September Term, 1972.]

*Decided April 13, 1973.*

The cause was argued before MORTON, MOYLAN and SCANLAN, JJ.

*Howard L. Cardin* for appellant.

*Mary Elizabeth Kurz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Rodney Watts, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, James McIntyre, was convicted in the Criminal Court of Baltimore by a jury, presided over by Judge Solomon Liss, of armed robbery. Upon this appeal, he contends:

(1) That he was denied his Sixth Amendment right to a speedy trial;

(2) That his in-court identification should have been suppressed as the product of an earlier impermissibly suggestive identification; and

(3) That the evidence was legally insufficient to permit the case to go to the jury.

The robbery occurred on July 30, 1971. The appellant was arrested on August 6, 1971. A preliminary hearing

was held on August 17. An attorney was appointed by the court to represent the appellant on August 20. That court-appointed attorney visited the appellant at the Baltimore City Jail on September 11. Until that point, the case had been progressing with acceptable expedition.

At that time, the lower tier of the Baltimore City Criminal Justice System was in the throes of transition from the old Municipal Court to the new District Court. Apparently as a result of that transition, the commitment papers and other papers on the appellant were lost or misplaced. No action was taken on the appellant's case between September 11, 1971, and March 1, 1972, some five months and three weeks later. When the error was discovered, the processing of the case resumed. The appellant was presented by the Grand Jury on March 1, 1972, and was indicted on March 9, 1972. In the meantime, Howard L. Cardin, Esq., representing the new Public Defender's Office, was appointed to represent the appellant, superseding the earlier appointment of the predecessor attorney. The appellant was tried and convicted on May 19, 1972.

The speedy trial provisions of the Sixth Amendment were engaged, of course, upon the occasion of the appellant's arrest on August 6, 1971. *United States v. Marion,* 404 U. S. 307, 92 S. Ct. 455, 30 L.Ed.2d 468 (1971); *State v. Hamilton,* 14 Md. App. 582, 287 A. 2d 791. The time period that gives us concern at bar, however, is the approximate six and one-half month delay between the action of the lower court in binding over the appellant to the Grand Jury and the subsequent action of the Grand Jury itself. This was no mere passage of time required for the orderly processing of the case, but a "delay" in the true sense of the word. It was a significant delay and is, therefore, one of "constitutional dimensions", requiring us to proceed with a fuller analysis, rather than dismiss the issue summarily. *State v. Lawless,* 13 Md. App. 220, 229-232, 283 A. 2d 160.

That analysis will require us to consider the interaction of three factors: length of delay, reason for delay, and prejudice. *Hall v. State,* 3 Md. App. 680, 686, 240 A. 2d 630.

The length of delay is six and one-half months. Although never to be condoned, that period, nevertheless, must be viewed realistically in the context of frightfully overtaxed criminal justice facilities and frightfully congested trial dockets in all major metropolitan areas, of which Baltimore City is a prime example.

The second factor to be considered is that of the reason for the delay—the factor of fault. The fault lies in part, though not entirely, with the State. The State is ultimately responsible for its procedures, including the transition from a Municipal Court to a District Court. Although in the light of *Barker v. Wingo,* 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972), waiver will not be dispositive of a defendant's claim, it is nevertheless a factor worthy of consideration. The appellant sat for the better part of six months and made no formal demands. However inartful his methods might have been, it is difficult not to conclude that he could somehow have managed to be heard by the court. Nor is the incomprehensible inaction of the appellant's first court-appointed attorney in any way attributable to the State. He was, for better or for worse, a defense functionary. Even in looking at the fault fairly attributable to the State, the law realistically recognizes gradations of turpitude. Pertinent here are our observations in *State v. Lawless, supra,* at 238-240:

> "There is nothing in the present case to suggest that either the attitude or the course of conduct of the State was 'purposeful or oppressive.' The State was certainly not motivated by 'bad faith'; nor was any action or inaction by the State 'a deliberate choice for a supposed advantage.' In terms of assessing 'fault,' the behavior of the State clearly would

not fall under the interdict of 'purposefulness' or 'oppressiveness.'

It is rather in the middle ranges of the 'reason' spectrum that analysis becomes less certain. Here the 'fault,' if any, on the part of the State is one of omission, rather than of commission. Here we are concerned not with an affirmative delay-causing decision, either for good cause or for bad cause, but rather with pure inaction. Even within the 'inaction' band, there are gradations. On the one hand, there is deliberate and knowing inaction in the face of clear and repeated demands for action. This is the brand of conduct contemplated by our addition of the adjectives 'capricious,' 'arbitrary' and 'unreasonable' to the lexicon of not-to-be-condoned behavior. . . . The attitude of the State here cannot be described as 'capricious,' 'arbitrary' or 'unreasonable.' There is nothing to suggest that the conduct of the State was 'more to meet the convenience of individuals,' 'more than mere negligence,' or an exhibit of 'unpardonable neglect and total indifference to the rights of the appellant'—the sort of motivational attitude we deplored in *Caesar*, at 49-50.

The case at bar presents us not with an instance of deliberate, knowing inaction but rather with an instance of what might be characterized as inadvertent inaction or, perhaps, as halting and less-than-diligent action."

In *Barker v. Wingo, supra,* the Supreme Court made it clear that a "more neutral" reason for delay, such as "negligence or overcrowded courts," will not weigh as heavily against the state as would a deliberate attempt to place a defendant at a disadvantage. The Court there said, at 407 U. S. 531:

"Closely related to length of delay is the reason the government assigns to justify the

delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

See also *State v. Hunter,* 16 Md. App. 306, 295 A. 2d 779.

The reason for the delay was only in part the fault of the State. That fault, in turn, was neither "purposeful or oppressive" nor even "capricious inaction in the face of demands for action". It was negligence, with an administrative changeover of a vast assembly line as an explanation, though not an excuse, for that negligence.

The third factor to be considered is that of prejudice. The initial question here is, "Who has the burden of proof?" The rule is that if the delay is "substantial," a presumption of prejudice is generated, with an attendant burden upon the State to rebut the presumption. On the other hand, if the delay is less than "substantial," the presumption is not triggered and the burden of showing prejudice falls upon the accused. The length of time that will constitute a "substantial" delay is not a constant, but fluctuates in interaction with the other factors. In the algebra of the Sixth Amendment, even a greater delay coupled with non-oppressive and non-purposeful motivation may well yield a product "less substantial" than would a significantly shorter delay coupled with oppressive or purposeful motivation. The interaction of all factors on even this intermediate question of whether the presumption will be generated is apparent when one contrasts our findings of "substantial"

delay in cases where the delays were of 12 months and 17 months, respectively,[1] with our findings of no "substantial" delay in cases where the delays were of 14 months, 16 months, 21 months, 21 months, and 23 months, respectively.[2] In the case at bar, a delay of six and one-half months, coupled with a reason for that delay only partially attributable to the State and involving the lesser fault of negligent inaction, is not such as to constitute a "substantial" delay. The presumption, therefore, is not triggered and the burden of showing prejudice remains upon the appellant.

The appellant's attempt to show prejudice is interesting, if unconvincing. He asserts a prejudice to the defense of the case. It ultimately boils down to the inability to locate an ostensible alibi witness, erstwhile girlfriend Elizabeth Malone. Although Mr. Cardin had represented the appellant for over two months and had conferred with him on four occasions, neither the name of Miss Malone nor of any other defense witness was ever brought up. No proffer was made of her testimony. Judge Liss's offer of a continuance to locate the missing Miss Malone was spurned. Although Miss Malone ultimately took on a name, the substantiality of the claim with respect to her seems linked to that of three or four other phantom witnesses who evanesced under the hard light of cross-examination:

> "THE COURT: Which witnesses specifically did you intend to call, Mr. McIntyre?
> A. Your Honor it was a young lady whom I was staying with over there on Calhoun Street, Elizabeth Malone.
> Q. Have you ever given her name to Mr. Cardin?
> A. No sir, I haven't.

---

1. *Caesar v. State,* 10 Md. App. 40, and *Wilson v. State,* 8 Md. App. 299.
2. *Brown v. State,* 4 Md. App. 141; *Frazier v. State,* 5 Md. App. 88; *King v. State,* 6 Md. App. 413; *Stevenson v. State,* 4 Md. App. 1; *State v. Williams,* 6 Md. App. 5.

Q. Well why not?

A. Well Your Honor it's quite a few witnesses names that I haven't given.

Q. Why haven't you given Miss Malone's name and address to Mr. Cardin?

A. Well, Your Honor, we hadn't discussed it.

Q. You have not discussed it?

A. No, sir.

Q. Well why not? You wanted witnesses in the case, didn't you?

A. I did.

Q. Did you give Mr. Cardin the names of any witnesses you wanted to call?

A. No, sir.

Q. Mr. Cardin has been in the case since March of 1972 is that correct?

A. Yes, sir.

Q. How many times has he spoken to you during that time?

A. Several times.

Q. How many is several, three, four?

A. Four times.

Q. In the course of those four conversations with Mr. Cardin have you ever given him the name of any witnesses that you wanted him to summon?

A. No, sir.

Q. Why not?

A. Well, myself, I know they can't be located.

Q. How can you possibly know whether they can be located when in answer to Mr. Cardin's question you said you lost contact with them?

A. Well I have sent my parents around to these people's houses to find out if they were still residing at that address.

Q. Well do you want time to find these witnesses? Are you asking the Court to grant you a postponement to give you time to find these witnesses?

A. They can't be found, Your Honor.

Q. How do you know they can't be found, Mr. McIntyre?

A. Because the houses that they were living in is now vacant or occupied by someone else.

Q. All of the witnesses you had?

A. They are either locked up—

Q. Some of them are locked up?

A. Yes.

Q. They can certainly be found, can't they?

A. I don't know.

Q. Well you know that they are locked up?

A. Not all of them.

Q. But some of them are locked up?

A. See, some of them are locked up.

Q. And you know where?

A. I believe—

Q. And you know where?

A. I don't know where."

Upon our independent constitutional review, we conclude that the claim of a lost witness, never discussed with counsel, not raised until the trial of the case was to begin, and for whom no further opportunity to search was desired, smacks of rank opportunism to assert a prejudice to buttress a speedy trial claim.

In looking to the ultimate interaction of the three factors before us, we conclude that the unfortunate but not inordinate delay of six and one-half months, coupled with only partial fault of the more venial variety, and coupled with the showing of prejudice as evanescent as its factual predicate, did not constitute a denial of the appellant's right to a speedy trial under the Sixth Amendment. The motion to dismiss all charges against the appellant was properly denied. The law does not lightly wield a sanction so ultimately destructive of society's fundamental right to have transgressors stand before the bar of justice upon the merits of the cause.[3]

---

3. "[J]ustice, though due to the accused, is due to the accuser

The appellant also moved to suppress any in-court identification of him by the robbery victim upon the ground that it was tainted by earlier and impermissibly suggestive confrontations. Judge Liss conducted a hearing, outside the presence of the jury, and denied the motion to suppress. He found that the victim's ability to recognize the appellant was based upon his opportunity to observe him at the time of the crime and not upon having seen him at a preliminary hearing. At the time of the robbery, the assailant had approached the victim from the front with a gun in his hand. The robbery occurred at 3 o'clock in the afternoon. The assailant had spoken to the victim. They stood for a time very close—"belly to belly". Upon our independent constitutional review, it is only academic to say that we see no indication of earlier impermissive suggestiveness. It is rather enough to say that we concur with Judge Liss that the in-court identification had an independent source and was not the product of any earlier extrajudicial confrontations, non-suggestive, permissibly suggestive, or impermissibly suggestive.

Upon the appellant's final contention, that the evidence was legally insufficient to permit the case to go to the jury, it is enough to say that the robbery victim positively identified the appellant in court as one of his two assailants. That is all that is required. *Wilkins v. State,* 5 Md. App. 8, 21, 245 A. 2d 80.

*Judgment affirmed.*

---

also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." Justice Cardozo in *Snyder v. Massachusetts,* 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674, at 291 U. S. 122.