ROBERT MICHAEL WILSON *v.* STATE OF MARYLAND

[No. 46, September Term, 1977.]

*Decided January 5, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Orrin J. Brown, III,* for appellant.

*Bruce C. Spizler, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

We hold, contrary to the decision of the Circuit Court for Carroll County, and in accord with the decision of the Court of Special Appeals, that the prosecution of Robert Michael Wilson by the State of Maryland for crimes he is alleged to have committed in May 1971 is not precluded by the speedy trial guarantee of the Sixth Amendment to the Constitution of the United States. In so holding, however, we bear in mind, as we emphasized in *Jones v. State,* 279 Md. 1, 7, 367 A. 2d 1 (1976), *cert. denied,* 431 U. S. 916 (1977), that "[a] defendant has no duty to bring himself to trial; the State has that duty. . . ." *Barker v. Wingo,* 407 U. S. 514, 527, 92 S. Ct. 2182 (1972). *See Epps v. State,* 276 Md. 96, 118, 345 A. 2d 62 (1975). It follows, therefore, that the State may not excuse delay in bringing an accused to trial merely because he is incarcerated for other offenses in this or other jurisdictions. As the Chief Judge of this Court observed in dissenting in *Jones,* the result reached by the majority "should serve as a bitter lesson to prosecutors and judges throughout the State not to risk playing Russian roulette with the public's right to have criminal defendants brought to the bar of justice on a timely basis." *Id.* 279 Md. at 22 (Murphy, C. J., dissenting). It is manifest that Wilson was not brought to trial with commendable dispatch, and we do not suggest that he was. As we shall see, it is primarily because of certain affirmative actions on the part of Wilson himself, resulting in a judicial order preventing trial during a period of the delay, which tips the balance so as to permit prosecution. Only the unique circumstances of this case lead to the conclusion that the failure of the State to effect an earlier trial did not violate the constitutional guarantee.

Wilson was arrested in Carroll County, Maryland on 26 May 1971. On 24 January 1972 six true bills (indictments nos. 3356 to 3361, inclusive) were filed in the Circuit Court for Carroll County presenting that on 26 May 1971 he committed five offenses of assault with intent to murder certain police officers, a burglary and fourteen other crimes arising out of those offenses. On 30 October 1975 all of the indictments were dismissed by order of the Circuit Court for Carroll

County upon Wilson's motion alleging that he was denied a speedy trial. On direct appeal by the State, the Court of Special Appeals vacated the order and remanded the case for trial. *State v. Wilson,* 35 Md. App. 111, 371 A. 2d 140 (1977). We granted Wilson's petition for a writ of certiorari. We affirm the judgment of the Court of Special Appeals.

## I

The federal constitutional dictate for a speedy trial is simply set out: "In all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial. ..." U. S. Const. amend. VI. However, in the decade since the Supreme Court of the United States declared in *Klopfer v. North Carolina,* 386 U. S. 213, 222-226, 87 S. Ct. 988 (1967), that the speedy trial clause of the Sixth Amendment applies to the states through the Fourteenth Amendment, that guarantee has spawned some 144 decisions of the Supreme Court of the United States and the appellate courts of this State.[1] The reason for the plethora of cases on the issue is readily apparent. Although the guarantee is plainly stated, and the factors to be considered in determining whether it has been violated have been firmly established, each case turns on its own particular facts. The infinite variety of circumstances bearing on the question and the vagaries of human conduct place each case in a unique factual posture, so that no case controls another as factually apposite.

The sanction for denial of the right to a speedy trial is severe — dismissal of the charge.[2] Thus, in each speedy trial

---

1. State v. Wilson, 35 Md. App. 111, 116, 371 A. 2d 140 (1977) indicates that prior to that case the speedy trial clause has been the concern of 13 decisions of the Supreme Court of the United States, 29 decisions of the Court of Appeals of Maryland, and 98 reported decisions of the Court of Special Appeals of Maryland. Since State v. Wilson the Court of Special Appeals has decided four cases involving the speedy trial clause: Brooks v. State, 35 Md. App. 461, 371 A. 2d 674 (1977); Brady v. State, 36 Md. App. 283, 374 A. 2d 613 (1977); Nocera v. State, 36 Md. App. 317, 374 A. 2d 608 (1977); Leonard v. State, 36 Md. App. 385, 373 A. 2d 1262 (1977).

2. "The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy." Barker v. Wingo, 407 U. S. 514, 522, 92 S. Ct. 2182 (1972).

case there is a direct confrontation between the rights of the accused and the rights of public justice. The courts are guided in this determination of which rights shall prevail in a given case by *Barker v. Wingo, supra*:

> "The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.
>
> "A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. 407 U. S. at 530.

We have accepted these four factors as expressed in *Barker*, deemed them to be of primary importance and applied them in resolving the speedy trial cases before us. *See Jones v. State,* 279 Md. at 6; *Erbe v. State,* 276 Md. 541, 546-547, 350 A. 2d 640 (1976); *Smith v. State,* 276 Md. 521, 527-528, 350 A. 2d 628 (1976); *Epps v. State,* 276 Md. at 104-109.

## II

The circumstances leading to the arrest of Wilson are set out in detail in the opinion of the Court of Special Appeals, *State v. Wilson,* 35 Md. App. at 132-134, and narrated in substance in an agreed statement in Wilson's brief pursuant to Maryland Rule 828 g. Suffice it to say that as a result of information received from a confidential informant, Wilson was observed by police officers *in flagrante delicto* burglarizing a Carroll County residence on 26 May 1971, fired at the officers, escaped, was apprehended later that night and shot during the course of his arrest. The next day he was charged with assault with intent to murder and burglary. We list subsequent events in chronological order.

| | |
|---|---|
| *6 June 1971* | Wilson was released on bail. He had flown to Maryland from Boston on the day of the burglary. Upon being released, he returned to Massachusetts. |
| *August 1971* | Doni Crone died. Wilson later claimed that she would have testified that she employed him to replevy her goods from the residence he broke and entered. |
| *5 August 1971* | Wilson was arrested in Massachusetts on a charge of accessory after the fact to manslaughter. Unable to make bail, he was detained in jail pending trial. |
| *November 1971* | Wilson was brought to Maryland and arraigned in the United States District Court for the District of Maryland on charges of conspiracy and interstate transportation of stolen traveler's checks. After arraignment, he was returned to Massachusetts and a federal detainer placed against him. |
| *January 1972* | Wilson was tried and found guilty of the Massachusetts charge, sentenced to 6½ to 7 years and incarcerated in the Massachusetts Correctional Institution. |
| *24 January 1972* | Six indictments charging Wilson with crimes committed in Carroll County on 26 May |

| | |
|---|---|
| | 1971 were filed in the Circuit Court for Carroll County. |
| *6 February 1972* | Wilson wrote the attorney representing him on the pending federal charges in Maryland asking if he had filed a motion for a speedy trial in the State case, and, if not, requesting that he do so. |
| *29 February 1972* | The attorney replied by letter that he did not believe that indictments had been returned. He advised against pressing for an indictment. |
| *April 1972* | Wilson was tried in the United States District Court for the District of Maryland on the federal charges, was found not guilty on 18 May 1972 and returned to Massachusetts on 2 June. |
| *12 July 1972* | Wilson was brought to Maryland pursuant to a federal writ of *habeas corpus ad prosequendum.* |
| *13 July 1972* | Wilson was arraigned in the United States District Court for the District of Maryland on an indictment charging interstate transportation of stolen jewelry. He asked the federal judge to return him to Massachusetts. |
| *14 July 1972* | Pursuant to writs of *habeas corpus* filed 13 July, Wilson appeared before the Circuit Court for Carroll County to be arraigned on the State charges. According to the |

State's Attorney for Carroll County, he became aware that Wilson would be in Maryland on 14 July less than two weeks before. Immediately prior to the arraignment Wilson consulted with a public defender. During the arraignment Wilson requested that he be represented by the attorney representing him on the federal charges. He told the court that he had no objection to postponing a conference to make such arrangement until the next time he was in Maryland. After the arraignment and his return to the Baltimore City Jail, he told an officer that he would like to see "one of these Public Defenders." He later claimed that he wrote a U. S. marshal on 13 July stating that he would like to remain in Maryland pending trial on the State charges.

*6 August 1972*   Wilson was returned to Massachusetts. He had not seen a public defender.

*24 August 1972*   A Carroll County detainer was sent to the Massachusetts Correctional Institution with a copy to Wilson. Wilson later asserted that on 25 August 1972 he signed a request for a speedy trial with respect to the Carroll County charges

and filed forms under the Interstate Detainer Act. There is no documentary evidence that he in fact did either.

| | |
|---|---|
| *31 October 1972* | Wilson filed a civil action in the United States District Court for the District of Massachusetts seeking a restraining order forbidding the State of Maryland, the United States District Court for the District of Maryland, and the State of Massachusetts · from removing him to the Carroll County Circuit Court or the United States District Court for the District of Maryland. |
| *1 February 1973* | A special prosecutor for the Carroll County case, appointed in October 1972, requested that the court set the case for trial as soon as possible. |
| *9 February 1973* | Two public defenders entered their appearance as counsel for Wilson. |
| *13 February 1973* | The case was scheduled for trial on 8 May 1973, and Wilson was so notified. |
| *9 April 1973* | A formal request was forwarded to the Massachusetts Correctional Institution to make Wilson available for trial in Carroll County on 8 May. |
| *1 May 1973* | The Circuit Court for Carroll County upon agreement of |

|  |  |
|---|---|
|  | counsel reset the trial for 10 July 1973. |
| *10 May 1973* | Wilson filed a *pro se* motion to dismiss the Carroll County indictments for lack of a speedy trial. |
| *5 June 1973* | A request was made to the Massachusetts Correctional Institution for temporary custody of Wilson so he could be tried in Carroll County on 10 July 1973. Wilson was notified of the request. |
| *15 June 1973* | Wilson filed an amended civil action in the United States District Court for the District of Massachusetts requesting a temporary restraining order. |
| *22 June 1973* | The United States District Court for the District of Massachusetts granted the requested restraining order. It directed that Wilson not be released from the Massachusetts Correctional Institution to either the State of Maryland or the U. S. marshal. The special prosecutor for Carroll County informed the Circuit Court for Carroll County by letter of the order and stated that, as a result, it was impossible to go to trial on 10 July. He also made known to the court "the authorized comment" of defense counsel that the defense did not want the case |

|  | to go to trial on 10 July 1973 because it would be impossible, under the circumstances, to make adequate preparations for trial in the absence of Wilson. |
| *October 1973* | John Robeshard died. Wilson alleged that Robeshard overheard a request that Wilson replevy goods which were in the Carroll County residence. |
| *17 December 1973* | Wilson was indicted in Massachusetts for conspiracy to murder Albert De Salvo, the "Boston Strangler." |
| *24 January 1974* | On or about this date the Governor of Massachusetts declared that he would take no action on requests for extradition of Wilson and would not consent to Wilson's removal from Massachusetts until the "Boston Strangler" charges had been resolved. The Governor ordered the Massachusetts prison authorities not to release Wilson. |
| *9 September 1974 to 1 October 1974* | The "Boston Strangler" case was tried and ended in a mistrial because of a hung jury. |
| *10 February 1975 to 5 March 1975* | The "Boston Strangler" case was retried and again ended in a mistrial because of a hung jury. |
| *April 1975* | Wilson finished serving his first sentence on the |

|                    | Massachusetts conviction as of April 1975. Although Massachusetts intended to pursue the "Boston Strangler" case, it indicated that it was willing to let him go to trial on the federal charges and on the Maryland charges before trying him a third time. A motion to dissolve the restraining order was filed on 14 April 1975 and granted on 28 April. |
| *28 May 1975* | The instant case was scheduled to be tried on 22 July 1975. |
| *11 July 1975* | Wilson filed a motion to dismiss the Carroll County indictments on the ground that he was denied a speedy trial. |
| *22-23 July 1975* | The motion was heard. |
| *16 October 1975* | The motion was reargued at the request of the court. |
| *30 October 1975* | The motion was granted. |

## III

### *The Length of Delay*

The elapsed time period between Wilson's arrest and the hearing on his speedy trial claim was a few days short of four years and two months. The Court of Special Appeals believed this to be "self-evidently of 'constitutional dimension' . . . many times over," and therefore presumptively prejudicial so as to require consideration of the other factors. *Wilson,* 35 Md. App. at 120-121. We agree. In *Epps,* 276 Md. at 111, we found that a one year, 14-day interval between arrest and trial was "presumptively prejudicial." In *Jones,* 279 Md. at 6, we

said: "Since the two year, five-month interval between Jones' arrest and trial was of considerably more than twice the duration of that in Epps, we are bound to inquire into the other factors included in the balancing process." [3]

*Reasons for the Delay*

We said in *Smith,* 276 Md. at 528, that different reasons for delay in prosecuting a defendant should be assigned different weights. In *Jones* we pointed out how this was done:

> "[A] continuum exists whereby a deliberate attempt to hamper the defense would be weighed most heavily against the State, a prolongation due to the negligence of the State would be weighed less heavily against it, a delay caused by a missing witness might be a neutral reason chargeable to neither party, and a delay attributable solely to the defendant himself would not be used to support the conclusion that he was denied a speedy trial." *Id.* 279 Md. at 6-7.

This recognized the categories of reasons for delay identified in *Barker:*

> "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such

---

3. "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Barker v. Wingo, 407 U. S. 514, 530-531, 92 S. Ct. 2182 (1972).

Thus, ordinarily, it is the particular circumstances which determine whether the quantum of elapsed time between arrest or the institution of criminal proceedings and the ultimate trial or hearing on a speedy trial claim is a delay of constitutional dimension which requires further inquiry. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* at 530. There is no one specific cutoff applicable to all cases before which a delay is not presumptively prejudicial and after which it is presumptively prejudicial. A certain period of delay may be of constitutional dimension in some circumstances and not in other circumstances.

The length of the delay is not merely a mechanism which triggers analysis under the other factors to be considered; it is also a factor to be considered in the analysis which it has triggered. State v. Wilson, 35 Md. App. 111, 120-121, 371 A. 2d 140 (1977).

as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* 407 U. S. at 531.

*See Erbe,* 276 Md. at 549. We explained in *Jones*:

"While we must scrutinize the entire interval between arrest and trial, and attempt to ascribe reasons for particular delays, it is not possible or even desirable to do so with mathematical precision; we will not count up the time chargeable to the State, that chargeable to the defendant, and those delays attributable to neutral reasons, multiply the number of days or months by a parameter assigned for each particular reason and then dismiss the indictment if the defendant ends up with the lower tally. Instead, delays must be examined in the context in which they arise and therefore a lengthy uninterrupted period chargeable to one side will generally be of greater consequence than an identical number of days accumulating in a piecemeal fashion over a long span of time. Finally, we must always bear in mind that the State has the duty to bring the defendant to trial, *Barker v. Wingo, supra,* 407 U. S. at 527, 92 S. Ct. at 2190, and thus lengthy delays by the State, particularly in the face of a defendant's assertion of his right, are especially significant." *Id.* 279 Md. at 7.

Eight months elapsed between Wilson's arrest and indictment. The State's Attorney for Carroll County gave as reasons for this delay the lack of an adequate prosecuting staff and the complexity of the case. He testified that he was the only prosecutor. His office was severely understaffed because the case load in Carroll County had quadrupled with the onset of the District Court System. He alone handled all of the cases, including the District Court cases and the

Juvenile Court cases, as well as advising the police and taking care of new complaints. The Wilson case involved the study of a great number of police reports. Numerous meetings with police were required to obtain additional facts. Further extensive investigation was ·necessary, for example, to determine who rented the cars driven by Wilson and other subjects at the time of the burglary, to discover where burglary tools — torches, cutters, and other items seized — had been obtained and by whom, and to ascertain precisely what occurred at the crime scene and thereafter, leading to Wilson's apprehension. All of this information had to be sifted and digested in order to decide who should be indicted and for what offenses. Although the ultimate responsibility for unintentional delays caused by over-crowded court dockets or understaffed prosecutors must rest with the prosecution rather than with the defendant, such circumstances are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense. *Strunk v. United States,* 412 U. S. 434, 436, 93 S. Ct. 2260 (1973); *Epps,* 276 Md. at 112. The pre-indictment delay here was a "more neutral reason" identified by *Barker,* 407 U. S. at 531 and quoted in *Erbe,* 276 Md. at 549. Wilson concedes this and dismisses the pre-indictment delay by stating: "The eight months from the date of the offense until indictment probably comes within that category that would be weighted less heavily against the State. The responsibility for that delay rests with the State. *Barker* probably best described it as negligence." In the . circumstances, the delay in indictment may not in all fairness be attributed solely to prosecutorial negligence; the fact that the State's Attorney's office was seriously understaffed and the complexity of the case are worthy of some consideration. Nevertheless the delay is properly chargeable to the State. We shall consider it in the balancing test, giving it such weight as the circumstances indicate. We believe that, in the "difficult and sensitive balancing process" in which we must engage, *Jones,* 279 Md. at 6, the pre-indictment delay here, standing alone, or considered with the other factors, is not of sufficient weight to tip the scale on the side of denial of a speedy trial.

Wilson claims: "Subsequent to indictment and until June 26, 1973, the record is clear that that period of time was purposeful and should be 'weighed heavily against the State.' " [4] He declares that these seventeen months "were intentional and oppressive, pure and simple." We do not see it quite that way.

Wilson concedes that he was in jail in Massachusetts but urges that there was no evidence to attribute the delay to his incarceration. He declares "Wilson was at the finger tips of the prosecutors of the State of Maryland under the Uniform Interstate Detainer Act. The State of Maryland intentionally decided not to invoke that act." He concedes, however, that "[t]here is nothing in either the docket entries or the exhibits contained in the record which suggests that [he] requested a speedy trial or filed any forms under the Interstate Detainer Act in Maryland." *See* Maryland Code (1957, 1976 Repl. Vol.) Art. 27, §§ 616A-616R; *State v. Barnes,* 273 Md. 195, 328 A. 2d 737 (1974). This, of course, did not relieve the State of its duty which it has, independent of the Act, to bring Wilson to trial.

Wilson also asserts that the reason he was not brought to trial between the filing of the indictments and the restraining order was that the State wanted to try him with a codefendant, that the prosecutor " 'assumed' the defense would probably be quite happy if [the trial] could be put off as long as possible," and that Wilson had no attorney, all of which, he urges, must be weighed heavily against the State. As we have indicated, "[w]hile we must scrutinize the entire interval between arrest and trial, and attempt to ascribe reasons for particular delays, it is not possible or even desirable to do so with mathematical precision .... [D]elays must be examined in the context in which they arise ...." *Jones,* 279 Md. at 7. The period between the filing of the indictments and the restraining order, are to be considered, subject to the caveat we have noted regarding the duty of the State, in light of Wilson's arrest and sentence in Massachusetts for accessory after the fact of manslaughter

---

4. It seems that Wilson meant 22 June 1973 when the United States District Court for the District of Massachusetts granted the restraining order he requested.

and his indictment and trial for conspiracy to murder the "Boston Strangler." Nor can that period be divorced from Wilson's own affirmative efforts in the United States District Court for the District of Massachusetts which were successful in preventing his return to Maryland.[5] Those efforts and the result of them did much to offset the reasons for delay weighed against the State.

## *The Defendant's Assertion of the Right*

Although Barker rejected the old "demand" doctrine whereunder the failure to demand a speedy trial forever barred a defendant, as a matter of law, from asserting the right to a speedy trial, it reaffirmed that the assertion or failure to assert his right was a significant factor in the overall analysis. *Id.* 407 U. S. at 528-529. *Barker* "requires us to give *repeated demands* for a speedy trial 'strong evidentiary weight.'" *Jones,* 279 Md. at 16 (referring to *Barker* at 531) (emphasis added). A court may weigh the "frequency and force of the objections." *Barker* at 529.

According to the agreed statement of facts, on 10 May 1973, Wilson filed a *pro se* motion to dismiss the indictments for lack of a speedy trial. This had been preceded on 31 October 1972 by his request to the United States District

5. Wilson now suggests that he requested the restraining order because "his constitutional rights regarding his 'right to a hearing' had been violated" and because "[h]e also believed that due to past violations the State of Maryland had lost jurisdiction." He alleges that "[h]is law suit was based on actions of the State of Maryland." He thinks it obvious that the State of Maryland in July of 1973, "was hanging on to the coat tails of the United States government to get custody of Wilson. Wilson in fact contended that the use of the federal habeas corpus to bring Wilson to Maryland circumvented the requirements of the Uniform Detainer Act. The State of Maryland, thus circumventing Wilson's rights to a Rendition Hearing paid the Federal Government to get Wilson to Maryland under the guise of a Federal Habeas Corpus. The 'fault' or cause of delay was a direct result of the conduct of the State of Maryland. Wilson had no choice but to protect himself against further violations."

The civil suit sought declaratory and injunctive relief and compensatory and punitive damages for his allegedly unlawful removal from Massachusetts for arraignment in the United States District Court for the District of Maryland and the Circuit Court for Carroll County. In a footnote to the Agreed Statement of Facts in his brief, Wilson says that at the hearing on his motion to dismiss the indictments he testified that he filed the civil action "to restrain his production in Maryland until the issues raised in the civil action were resolved." In a footnote in his brief he states: "Implicit in all of this is the question of whether a person waives one constitutional right while claiming another." Other than to point out that "*Barker* does not go into waiver; just the cause of delay," he does not pursue the point.

Court for the District of Massachusetts to issue an order *temporarily* restraining the removal of him to Maryland, and was followed on 15 June 1973 by filing an "amended civil action" in the federal court for such an order. The order was issued a week later. The motion to dismiss was in the wake of notification to Wilson as of 13 February 1973 that trial had been scheduled for 8 May 1973, of a formal request on 9 April 1973 to the Massachusetts Correctional Institution to make Wilson available for trial on the scheduled date, and agreement of counsel on 1 May 1973 to reschedule the trial for 10 July 1973. The motion was also made in the face of what Wilson said at his arraignment in the Circuit Court for Carroll County on 14 July 1972. At that time, in discussing appointment of counsel, the court asked: "In the event we cannot get an attorney appointed at this time to handle this case, would you have any objection to having this conference with you postponed until you come back here for your Federal trial?" Wilson replied: "No objection, whatsoever, Your Honor, *as long as I don't go to trial, Your Honor, for this right away.*" (Emphasis added). The court assured him that he would have sufficient time but that there were not funds "to send attorneys travelling around." Wilson added: "I don't expect that." The colloquy ended in this vein:

> "COURT: Well if that's satisfactory that's what we'll do. I'll get in touch with the Public Defender's Office and tell him what the problem is and see what we can get. If we can't get anybody today, which I doubt, we'll have to wait until you come back to Maryland the next time. You have no objection.
>
> MR. WILSON: No objection whatsoever, your Honor." [6] *See Wilson*, 35 Md. App. at 138.

---

[6]. As illustrative of the mendacity of Wilson, the Court of Special Appeals contrasted what Wilson said at his arraignment with the characterization of his arraignment in his 10 May 1973 motion to dismiss:

"The State of Maryland waived jurisdiction and denied the defendant a speedy trial when he was before the Honorable Court on July 14, 1972.

The Petitioner was removed to State of Maryland and thereafter taken before the Carroll County Circuit Court on July 14, 1972, and *Petitioner was ready for trial,* and thereupon the Circuit Court for the State of Maryland waived all jurisdiction by releasing Petitioner out of their custody and permitting Petitioner to be moved to Massachusetts *when he was prepared for trial."* (Emphasis

The Court said in *Barker*: "Whether and how a defendant
asserts his right is closely related to the other factors . . . .
We emphasize that failure to assert the right will make it
difficult for a defendant to prove that he was denied a speedy
trial." *Id.* 407 U. S. at 531-532. *See Erbe,* 276 Md. at 551. We
conclude that, in the circumstances, there is little by way of
assertions by Wilson of his speedy trial right to provide
evidentiary weight in determining whether he was deprived
of the right.

## Prejudice to the Defendant

*Barker* did much to clear the air regarding prejudice in the
speedy trial concept. The ,presumption of prejudice arises
when review is necessitated. When delay is of "constitutional
dimension," the four factor balancing test is required and
prejudice is presumed. *Wilson,* 35 Md. App. at 123-124.[7] The
presumption is rebuttable with the burden being on the State
to rebut it. Even when prejudice is established, however, by
the presumption or through affirmative evidence, it is but one
of the four interrelated factors to be weighed in the balance,
the weight to be given it depending upon its nature. So in
*Barker*, the prejudice was "minimal;" there was an "absence
of serious prejudice." 407 U. S. at 534. "Prejudice . . . should
be assessed in the light of the interests of defendants which
the speedy trial right was designed to protect. [The Supreme
Court] has identified three such interests: (i) to prevent
oppressive pretrial incarceration; (ii) to minimize anxiety and
concern of the accused; and (iii) to limit the possibility that
the defense will be impaired." *Id.* at 532.

(i)

With respect to lengthy pretrial incarceration, *Barker* said:

"The time spent in jail awaiting trial has a
detrimental impact on the individual. It often means

supplied) *State v. Wilson,* 35 Md. App. 111, 139-140, n. 16, 371 A. 2d
140 (1977).

**7.** *Compare,* McIntyre v. State, 17 Md. App. 526, 531, 302 A. 2d 672, *cert.
denied,* 269 Md. 762 (1973); Caesar v. State, 10 Md. App. 40, 43, 267 A. 2d
750 (1970); Wilson v. State, 8 Md. App. 299, 306, 259 A. 2d 553 (1969); King
v. State, 6 Md. App. 413, 418, 251 A. 2d 628 (1968); Frazier v. State, 5 Md.
App. 88, 92-93, 245 A. 2d 614 (1968), *cert. denied,* 252 Md. 730 (1969);
Stevenson v. State, 4 Md. App. 1, 13-16, 241 A. 2d 174, *cert. denied,* 251 Md.
747, 752 (1968).

loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious." *Id.* 407 U. S. at 532-533.

As to Wilson, any presumed prejudice simply evaporates when assessed in light of this interest. Except for ten days immediately following his arrest, a time patently not oppressive, Wilson suffered no incarceration at the hands of the State of Maryland. So, if in fact, Wilson's incarceration had the detrimental impact suggested by *Barker*, it was not the doing of Maryland. He was not confined because he was awaiting trial on the Maryland charges; the pretrial incarceration denounced by *Barker* did not exist. He was subject to incarceration in Massachusetts whether he was tried in Maryland or not.

(ii)

In the circumstances surrounding Wilson, we find little, if any, prejudice upon assessment of the second interest. Prejudice in terms of anxiety and concern might arise because the accused, even if not incarcerated, may be disadvantaged "by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." *Barker*, 407 U. S. at 533. Wilson was not in the situation contemplated in *Klopfer v. North Carolina, supra.* It cannot be fairly said, in the circumstances surrounding Wilson that, while on bond awaiting trial he might be subjected because of the Maryland charges to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes. *Id.* 386 U. S. at 221-222. *See Moore v. Arizona*, 414 U. S. 25, 27, 94 S. Ct. 188 (1973). We agree with the Court of Special Appeals that there is no analogy between the sort of situation in *Klopfer* and the one in the case before us. *Wilson*, 35 Md. App. at 128-131.

(iii)

Impairment to the defense is the most serious of the possible prejudices caused by delay "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U. S. at 532. Death or disappearance of witnesses or their inability to recall accurately events of the distant past is ordinarily an indication of prejudice. *Id.* at 532. Wilson claims that two key witnesses died during the pendency of trial and that thereby his defense was seriously impaired. His contention is belied by the massive case against him. To show that his theory of defense ostensibly supported by the dead witnesses is but "a legal grasping at insubstantial straws," *Wilson* at 135, we set out the events leading to Wilson's arrest as summarized by the Court of Special Appeals:

> "[Wilson] was caught *in flagrante delicto* as he was in the act of burglarizing the Carroll County home, located near Westminster, of Baltimore attorney H. Morton Rosen. The Maryland State Police had received advance warning, through a confidential informant, that [Wilson] would be flying in from Boston to meet with local accomplices and then to execute the burglary. Three or four days prior to the crime, the codefendant Nevens had flown to Boston. On the day of the crime, [Wilson] flew in from Boston, met with Nevens and together they went to the home of one Benjamin E. Masters. A State Police discreet surveillance had picked [Wilson] up as he was driving from the Baltimore-Washington International Airport. Two girls, Joan Harriet Kessler and Mary Pauline Masters, testified for the State that they accompanied both [Wilson] and Nevens to Carroll County for the purpose of breaking into the Rosen home. The foursome traveled to Westminster in two separate automobiles, both of which had been leased in the name of one Doni Crone. One of the automobiles was used by Nevens and [Wilson] to go to the crime scene. The other, occupied by the two

girls, was kept as an available back-up vehicle on a restaurant parking lot somewhat less than a mile away.

"Before leaving Baltimore, [Wilson] and Nevens assembled various tools, including wrenches, crowbars, pliers, cutting torches, acetylene tanks, oxygen tanks and gauges (appropriate equipment for opening a safe). When [Wilson] and Nevens drove up to the rural Rosen home at approximately 9:30 p.m., Lt. Frank Mazzone and four other members of the State Police were secretly waiting inside the home. They were stationed at different positions throughout the house. Several lights had been deliberately left burning. One was pointed from the inside at a pair of French doors, through which entry was ultimately made. Mazzone was crouched inside where he could observe this doorway . . . .

"The automobile parked beside the Rosen home and [Wilson] got out. Several of the State troopers observed the figure of one of these two men try one door, move across the outside of several windows, and then move to the French doors previously mentioned. There were several loud knocks, which were unanswered. Lt. Mazzone then heard a prying and scratching at the door for approximately one minute. There was then a loud bang and the door broke open. Lt. Mazzone made a positive identification of [Wilson] as the man coming through the door. The light shone full upon his face for approximately twenty seconds. [Wilson], who had entered with gun drawn, moved into a hallway beyond Mazzone's view.

"Stationed down the hallway which [Wilson] entered was Corporal Peter Edge. As [Wilson] approached on a collision course, Edge shouted out, 'State police!' [Wilson] fired in the direction of the voice. The bullet entered the wall, at belt level, inches from Corporal Edge. Corporal Edge, also startled, prematurely triggered his shotgun before

getting it turned toward [Wilson]. It splattered a side wall. [Wilson] bolted from the house. The State police immediately followed. The car was abandoned at the crime scene. Nevens fled across the fields in one direction. [Wilson] fled in another. With only handheld searchlights to direct their fire, the State troopers directed a number of shots at the fleeing men but none made contact. There ensued for several hours a manhunt with helicopters and searchlights, as a large number of State troopers scoured a several square-mile area. [Wilson] was not found.

"Meanwhile, several State troopers anticipated that he might make his way across the woods to the back-up vehicle which was parked on the lot of Baugher's Restaurant. They went there and removed the two girls from the car and stationed two troopers, slouched down, inside. At approximately midnight, over two hours after the aborted burglary, one of the troopers observed [Wilson] approaching the car. The trooper got out of the vehicle. When he observed [Wilson] make a move toward his hip, the trooper fired. [Wilson] collapsed on the pavement of the parking lot, with a bullet in the stomach. He was identified by Lt. Mazzone minutes thereafter and was then flown to the Baltimore City Hospital by State helicopter." *Wilson* at 132-134.

The two "key witnesses" were Doni Crone and John Robeshard. Crone died in August 1971, within less than three months of the commission of the crime. Wilson concedes that the delay had not reached constitutional dimension at the time of her death. Robeshard died in October 1973. Before his death, however, on 13 February 1973, trial had been set for 8 May 1973 and formal request was made to the Massachusetts authorities on 2 April 1973 to make Wilson available. He was not available and on 1 May trial was reset for 10 July. That date could not be met because of the civil action brought by Wilson in the Massachusetts federal court. *Wilson* at 134-135. Even more relevant to the matter of prejudice to the defense than the dates of the death of the

witnesses, is the nature of the defense asserted by Wilson. He apparently desired to advance the notion that when he broke into the Rosen dwelling he was not committing a burglary since Crone had employed him in some unspecified capacity to "replevy" personal property belonging to her that Rosen was holding for some reason. Crone, according to Wilson, would have so testified, and Robeshard would have testified that he overheard Crone request Wilson to "replevy" her goods. In light of this proffer, the Court of Special Appeals answered the allegation of prejudice arising from the death of the two witnesses thus:

> "We know of no theory that would make such testimony legally material in the factual context of this case." [8] *Wilson* at 135.

The intermediate court explained:

> "If such surreptitious entry in the middle of the night — with crowbars, acetylene torches, etc. — were conceivably material as a defense to the burglary charge, it could not by the farthest stretch of the imagination justify opening fire upon the State police (or any other occupants) therein." *Id.* at 135.

We believe that the death of the two "witnesses" resulted, at most, in "a strained and speculative possibility of prejudice with essentially minimal values." *Wilson* at 136. As in *Barker,* 407 U. S. at 534, there was an "absence of serious prejudice."

Applying the balancing test by assessing the four factors relevant in determining whether Wilson was deprived of his right to a speedy trial in the circumstances of the delay here, the conclusion that he was not denied the right is crystal clear.

## IV

Wilson presents two other contentions which are readily determined. He claims: "The interstate agreement on

8. Grasping upon the intent element of burglary, Wilson asserts that this is "a blatant misstatement of the law . . . ." He adds: "The 'burglars' were in the residence in question for the purpose of retrieving property which belonged to Doni Crone." The suggestion that the proffered testimony of Crone and Robeshard would, in the circumstances, be material to establish lack of felonious intent in the breaking of Rosen's dwelling is frivolous.

detainers commands the indictments against Wilson be dismissed." This is answered by his concession which we noted, *supra*, that "[T]here is nothing in either the docket entries or the exhibits contained in the record which suggests that [he] requested a speedy trial. or filed any forms under the Interstate Detainer Act in Maryland." *See State v. Barnes, supra.*

Wilson finally complains about the length of time taken by the Court of Special Appeals to render a decision on appeal. He apparently wants this period to be included in the length of delay factor and to be assessed as chargeable to the State in the determination of whether he was denied a speedy trial. The short answer is that within the sense of the Sixth Amendment the right to a speedy trial does not include the right to a speedy appellate review. *See Ash v. State*, 238 Md. 317, 320, 208 A. 2d 691 (1965); *State v. Lawless,* 13 Md. App. 220, 230, 283 A. 2d 160 (1971), *cert. denied*, 264 Md. 749, *cert. denied*, 409 U. S. 855 (1972); *Davis v. State*, 4 Md. App. 492, 498, 243 A. 2d 616 (1968), *cert. denied*, 252 Md. 730 (1969); *Brown v. State*, 2 Md. App. 388, 395, 234 A. 2d 788 (1967). *See also Harrison v. United States*, 392 U. S. 219, 221 n. 4, 88 S. Ct. 2008 (1968).

## V

We hold that the trial court erred in ordering the dismissal of the indictments returned against Wilson and that the Court of Special Appeals properly vacated that order and remanded the case for trial. We are constrained to signify again, however, that our decision may have been otherwise were it not for the restraining order sought and obtained by Wilson.

> *Judgment of the Court of Special Appeals affirmed; costs to be paid by petitioner.*