REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1800

September Term, 2013

MARK PETERS

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Arthur,
Moylan, Charles E., Jr.
         (Retired, Specially Assigned),

                              JJ.

Opinion by Eyler, Deborah S., J.

Filed: August 26, 2015

The primary issue in this appeal is whether the police had probable cause to search an apartment in a multi-unit apartment building to apprehend suspects in a shooting incident.

In the Circuit Court for Baltimore City, Mark Peters, the appellant, was indicted for attempted murder and numerous other crimes stemming from that incident. Before trial, he moved to suppress tangible evidence recovered in the search of the apartment, which was carried out without a warrant. The court denied the motion on the ground that exigent circumstances justified the warrantless search and, even if it did not, the inevitable discovery doctrine applied.

A jury convicted Peters of first-degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, wearing, carrying, and transporting a handgun, attempted robbery with a dangerous weapon, and possession of a regulated firearm by a disqualified person. He was sentenced to an aggregate term of 25 years' imprisonment.

On appeal, Peters presents three questions for review, which we have reordered and rephrased:

I. Did the circuit court err in denying his motion to suppress tangible evidence?

II. Was the evidence legally sufficient to sustain his conviction for attempted robbery with a dangerous weapon?

III. Did the circuit court err in failing to dismiss for lack of a speedy trial?

We hold that the circuit court erred in denying the motion to suppress, and therefore shall reverse the judgments of conviction. We find no merit in Peters's other issues. Accordingly, we shall remand the case to the circuit court for further proceedings.

**I.**

**(A)**

The charges against Peters all concerned the non-fatal shooting of Vaughn Johnson, on January 27, 2012. Peters filed a pre-trial motion to suppress from evidence two handguns and a ski mask the police recovered from 5933 Radecke Avenue, Apartment J. He argued that the items were obtained by the police in a warrantless search in violation of the Fourth Amendment.

The suppression hearing was held on the day of trial. It was interrupted by hearings on other motions in the case and by jury selection and was completed on the second day of trial. Officer Bryan Loiero and Sergeant Lamont Davis of the Baltimore City Police Department ("BPD") testified for the State. Officer Zachary Wein, also with the BPD, in its SWAT Unit, was called by the defense. By agreement, the transcript of a recorded statement by Janee Gross, Johnson's girlfriend, was admitted into evidence. The defense introduced into evidence an "Incident Case Folder" prepared by Sergeant Davis and a search and seizure warrant for Apartment J, including the warrant application. The evidence at the suppression hearing showed the following.

On the night in question at 8:55 p.m., Officer Loiero was on routine patrol when a call went out for a possible shooting in progress at 5925 Radecke Avenue. That address is one of several apartment buildings that make up the Garden Village apartment complex, in Baltimore City. Officer Loiero was a block away and arrived at the scene in less than a

2

minute. He entered building 5925 and found Johnson lying on the floor next to the door to his apartment, bleeding from two gunshot wounds to his torso.

Officer Loiero called for an ambulance, quickly determined that no one was inside Johnson's apartment, and asked Johnson who had shot him. Johnson replied that the shooter was a man he did not know who "was with Ty, he was with Ty." He described the shooter as light-skinned, with a mustache, wearing a dark jacket and carrying two guns. He told Officer Loiero that Ty lived "somewhere on St. Regis," a street the officer knew to be a block north of the apartment complex.

After radioing that information to the dispatcher, Officer Loiero spoke with Janee Gross, who was in the building. She had visited Johnson that night in his apartment. When she was ready to leave, he walked her to her car, which was in the parking area in front of his apartment building, and returned to his apartment. She sat in her car, waiting for it to warm up. Suddenly she saw two men dressed in black and wearing black face masks running away from Johnson's apartment building and into one of two other apartment buildings in the complex. She called Johnson, who did not answer his cell phone. She entered his apartment building and found him right after he had been shot.[1] Gross pointed out for Officer Loiero the buildings she saw the two men enter. They were buildings 5931

---

[1]There were no facts elicited at the suppression hearing about whether one could enter any of the apartment buildings without a key or without being buzzed in by an occupant. Facts adduced at trial showed the apartment buildings required a key or a buzzer response for entry, and that Gross was able to enter Johnson's building because a pizza delivery man had just been buzzed in and he held the door for her.

and 5933 Radecke Avenue. She did not know which of the two buildings the men had entered. She did not see any guns.

Numerous police units converged on the apartment complex, and Officer Loiero called for additional units to respond to the 5931 and 5933 buildings because "apparently the suspects had ran into that location." From past experience, Officer Loiero knew that each apartment building in the complex was two stories with a single front door for ingress and egress. He directed all responding officers to form an "inner perimeter" around both buildings, and not to allow anyone to enter or exit either building. According to Officer Loiero, the "inner perimeter" was in place within a matter of minutes after he arrived at the crime scene.

At about 9:15 p.m., a SWAT team arrived and began an apartment-by-apartment search, first of building 5931 and then of building 5933. Each building had twelve apartments, designated A through L. The SWAT team took the same approach at every apartment. A SWAT team member holding a handgun and a ballistic shield, known as a "bunker," knocked on the door, announcing police presence. If there was a response, the team member directed the occupant(s) to exit. If there was no response to repeated knocking, the SWAT team used a battering ram to force open the door. In both situations, the SWAT team members swept the apartment, looking for any occupants (or additional occupants), and if any were found ordered them out. Another SWAT team member, called the "hands man," obtained the occupants' names and information. After being interviewed

4

by the "hands man," occupants were escorted to buses that had been brought in, where they were questioned and directed to wait until the entire search operation had been completed.

In entering and searching each apartment, the SWAT team was looking for an occupant named "Ty." The team's apartment-by-apartment search of building 5931 did not reveal any apartment occupant by that name. The team moved on to building 5933. The team members searched Apartments A through I in that building without finding an occupant named "Ty." At 2:00 a.m., the SWAT team reached Apartment J. Officer Wein knocked on the door. He was holding his handgun and bunker. A man answered the door; two other men were with him. The men were ordered to show their hands and exit the apartment. The "hands man" spoke to them and learned that their names were Tyreze Braxton, Tyrell Braxton, and Mark Peters (the appellant). They were handcuffed.

Officer Wein, followed by other SWAT team members, entered Apartment J and proceeded to clear it, "making sure there was nobody else that wasn't at the front door, that may have been armed or dangerous in that location." Officer Wein entered the bathroom and pulled back the shower curtain. He testified that, as he did so, his bunker hit a grate covering a vent on the shower wall, knocking the grate to the floor. After determining that the bathroom was clear, he cleared the rest of the apartment, finding no other occupants. He returned to the bathroom to place the grate back over the vent. He noticed a black object inside the vent that looked like a T-shirt or a hat. There appeared to be objects inside it, but he could not see what they were. Officer Wein did not touch anything in the vent. He notified his superior officer about his discovery.

5

Sergeant Davis had taken charge of the crime scene shortly after Officer Loiero called for units to form a perimeter around buildings 5931 and 5933. At around 3:15 a.m., Sergeant Davis was notified that the SWAT team had found a person named "Ty" in Apartment J of the 5933 building. Sergeant Davis went to that apartment. One of the SWAT team members told him there was something in the vent in the bathroom. Sergeant Davis looked inside the bathroom vent and saw what "looked like a black towel or something, it was bulky." He "removed it and it was a ski mask and inside the ski mask were two handguns." He "folded it back, . . . placed it back inside the vent." Although Sergeant Davis clearly testified on direct and cross-examination that he could not see what was inside the "bulky" towel-like item in the vent until he removed it from the vent, his testimony changed somewhat when the court pressed him as to why he did not obtain a search warrant before seizing the items from the vent. He claimed that when he looked in the vent he could see "what looked to be the handle of a gun wrapped up in what I believed was a towel," but he was "[n]ot 100 percent" certain that he could identify the object as a gun and that was why he removed the entire thing from the vent.[2]

While another officer secured Apartment J, Sergeant Davis prepared an application for a search and seizure warrant for that apartment. His affidavit in support of the warrant application reads, in pertinent part:

> As other patrol officers arrived at the scene they were advised by concerned citizens that approximately 2-3 unidentified black males fled from the location

---

[2]Officer Wein, who first saw the object in the vent, did not testify that he saw the handle of a gun when he looked in the vent.

of 5925 Radecke Avenue where the Attempted Murder of Mr. Vaughn Johnson occurred and ran into the apartment building of 5933 Radecke Avenue.[3] Northeast District Patrol officers began to set up a perimeter due to the fact that there were no rear exits from the apartment building. The Baltimore City Police Departments [sic] SWAT Team was contacted and dispatched to the area at which time a command post was assumed.

The Baltimore City Police Department's SWAT Team began to conduct an orderly and methodical security search of each apartment within the building of 5933 Radecke Avenue for the safety of the residents within.[4] Upon reaching 5933 Radecke Avenue Apartment J., the Baltimore City Police Department's SWAT Team accosted three unidentified black males within the apartment. While clearing the apartment, the SWAT Team noticed an open air vent within the bathroom without the cover attached to it. For Officer Safety issues the SWAT Team observed the butt of what they believed to be a handgun.[5] At that point the Baltimore City Swat [sic] Team secured the unidentified males along with the apartment of 5933 Radecke Avenue Apartment J for the purposes of obtaining a Search & Seizure warrant to recover any and all ballistic evidence that may be related to the Attempted Murder of Mr. Vaughn Johnson and the fruits of any other crime.

According to Sergeant Davis, at about 8:30 a.m., the police reentered Apartment J to execute the warrant; and they left at around 9:30 a.m. He acknowledged that the crime lab report shows that the two guns were removed from Apartment J at 8:17 a.m. Sergeant Davis

---

[3]This information is incorrect. The only information received about the men seen running from Johnson's apartment building was obtained from Gross, who reported seeing two men (not two or three men) and who reported that they fled into *either* the 5931 building *or* the 5933 building.

[4]This inaccurately omits that the police searched the 5931 building before searching the 5933 building.

[5]This information also is incorrect. The vent was not open when Officer Wein entered the bathroom; neither he nor any other member of the SWAT team "observed the butt of what they believed to be a handgun." Officer Wein testified that this information was not correct.

7

maintained that the guns only were removed after the warrant issued, and pointed out that the return for the warrant shows that it was executed at 10:00 a.m.

The circuit court denied Peter's motion to suppress. It ruled that the warrantless search of Apartment J of building 5933 was justified by exigent circumstances and, even if it was not, the guns and ski mask were admissible under the inevitable discovery doctrine:

> The police arrived moments after a shooting. There was . . . two bullet holes in the victim, so they knew that it was a gun. Ms. Gross reports that she saw two people run into either 5933, 5931. SWAT is called almost immediately. The building – the two buildings are secured. There's a systematic search of the apartments. I'm satisfied that these are exigent circumstances which would permit the entry into Apartment J.
>
> Once inside the apartment, Officer Wein testifies that a vent falls open. He sees what appears to him as a black material, which is a small enough place to hide guns. And I am satisfied that he would have had a sufficient exigency at that time to search the vent. But even if he – when he did not search the vent, eventually it was searched. And even if there was not a sufficient exigency, I find that since the search warrant was obtained soon after that, that the State had . . . used proper and predictable investigatory procedures and that those procedures would have inevitably have resulted in the discovery of the evidence in question.

There was no testimony at the suppression hearing about the connection, if any, the two "Tys" and Peters had to Apartment J. At one point the prosecutor attempted to elicit evidence about Peters's address. The court interrupted, saying that the State had waived its right to challenge standing.[6] The prosecutor did not proffer what the evidence would have shown.

---

[6]The prosecutor was not making a standing argument at the time the court interjected. No standing argument was made below, and there is no standing argument advanced on appeal.

8

The evidence on this point was adduced on the second day of trial (which was the first day testimony was taken) and was not disputed. We add it for the sake of completeness, and also because it is evidence the court should not have disallowed. Apartment J in building 5933 was leased by Tyreze Braxton, who lived there alone.[7] Tyrell Braxton, his twin brother, was living on St. Regis Avenue. On the evening in question, soon after Tyreze got home from a work event, Tyrell and Peters arrived at his apartment. The Braxton twins had known Peters for many years, as they had mutual relatives. After awhile, Tyrell asked Tyreze if he would drive them to their aunt's house. Tyreze agreed, but discovered that the police had surrounded the building and would not let anyone leave. The men remained in Tyreze's apartment. They fell asleep and later were awoken by the SWAT team.

Tyrell and Peters were charged with crimes arising out of the shooting of Johnson. The charges against Tyrell were *nol prossed*. Tyreze was not charged with any crime.

### (B)

Peters contends the circuit court erred by denying his motion to suppress because there was no exigency to justify the police entering Apartment J without a warrant to search for the suspects in the Vaughn Johnson shooting.

The well-established standard of review is as follows:

> "In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the evidence contained in the record of the suppression hearing. The factual findings of the suppression court and its

---

[7]At the time of the shooting, Tyreze was a cadet in training with the Maryland State Police. At trial, he testified for the State. By then, he was a member of the Maryland State Police.

9

conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. We undertake our own constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case."

*McFarlin v. State*, 409 Md. 391, 403 (2009) (quoting *Rush v. State*, 403 Md. 68, 82-83 (2008) (citations and footnote omitted)).

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citation omitted). *See also Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). As the Supreme Court has explained: "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* at 590. *See also Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011) (stating that a search of a home without a warrant may be justified when "'"the exigencies of the situation'" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment'" (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978))).

The exigent circumstances exception to the warrant requirement "is a narrow one[,]" *Williams v. State*, 372 Md. 386, 402 (2002) (citations omitted), and the State bears a "'heavy burden,'" *id*. at 407 (citation omitted), of proving "'specific and articulable facts to justify the finding of exigent circumstances.'" *Id.* (quoting *United States v. Shephard*, 21 F.3d 933, 938 (9th Cir. 1994)). Its burden "may not be satisfied 'by leading a court to speculate about what may or might have been the circumstances.'" *Id.* (quoting *United States v. Driver*, 776

10

F.2d 807, 810 (9th Cir. 1985)). The facts are to be considered as they appeared to the police officers at the time of the warrantless entry. *Id.* at 403. The extent of the warrantless entry is "'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).

The two most common exigent circumstances are hot pursuit of a fleeing felon, *see*, *e.g.*, *United States v. Santana*, 427 U.S. 38, 42-43 (1976), and imminent destruction of evidence, *see*, *e.g.*, *Schmerber v. California*, 384 U.S. 757, 770-71 (1966). In the case at bar, the circuit court's exigency finding was based solely upon "hot pursuit." The parties focus their arguments on that type of exigency, and do not argue that imminent destruction of evidence or any other type of exigency existed or was found.[8]

Exigent circumstances, standing alone, will not justify police entry into a home without a warrant. Exigency only has meaning as an exception to the warrant requirement. Therefore, for exigency to justify police entry into a home without a warrant, the police must have probable cause that would support the issuance of a warrant. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (stating that to make a lawful entry into a house, the police "need either a warrant or probable cause plus exigent circumstances[.]"); *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) (en banc) ("[e]mergency is not enough"; police only may enter a house without a warrant or consent of the homeowner if they have probable cause to believe that a search of that house will produce evidence fruitful to the criminal

---

[8]The State did not argue below and does not argue on appeal that destruction of evidence was an exigency in this case. In his brief, Peters argues that destruction of evidence was not an exigency here.

11

investigation); *Fisher v. Volz*, 496 F.2d 333, 339 (3d Cir. 1974) (observing that the Supreme Court "has been quite clear that [exceptions to the warrant requirement], based on 'exigent circumstances,' do not dispense with the requirement of probable cause").

The threshold question in the case at bar is whether the police had probable cause to support their entry into Apartment J in building 5933. Only then would exigent circumstances make their entry lawful.

The objective the police were seeking to accomplish in systematically entering and searching all the apartments in buildings 5931 and 5933 was to find and arrest the men responsible for shooting Johnson. "Probable cause [to arrest] exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Longshore v. State*, 399 Md. 486, 501 (2007) (quotations and alterations omitted).

The facts and circumstances known to Officer Loiero, and communicated to the SWAT team members, were that Johnson was accosted by two men, one known to him and named "Ty." The other man, who was not known to him except that he was a friend of "Ty," was carrying two guns and was wearing a dark jacket. That man shot Johnson. Immediately after the shooting two men dressed in black and wearing black masks were seen running away from Johnson's apartment building and into either apartment building 5931 or 5933. Johnson and Gross were the sources of these facts, and the facts were based on their very recent firsthand observations.

12

These facts were reasonably reliable and supported a rational inference that the two men that Gross saw run out of Johnson's apartment building and into building 5931 or 5933 were "Ty" and the shooter. *See generally* 2 Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment*, § 3.4(a), at 265 (5th ed. 2012) (hereinafter "*LaFave*") (reliability of victims and eyewitnesses to a crime is presumed, and collecting cases). They thus created probable cause to believe that "Ty" and the man with him were the people who had committed the offenses against Johnson. If the police had been on the scene when "Ty" and the shooter ran out of Johnson's apartment building, they would have had probable cause to arrest them.

In the circumstances here, however, probable cause *to arrest* was necessary but not sufficient. *See* 3 *LaFave*, § 6.1(a) at 350-51 (if police enter "private premises for the purpose of making an arrest," they must "at a minimum" have probable cause to believe the suspect has committed a criminal offense). The police also had to have probable cause *to search*, *i.e.,* knowledge of facts and circumstances giving rise to a reasonable belief that "the legitimate object of a search is located in a particular place." *United States v. Steagald*, 451 U.S. 204, 213 (1981).

In two cases, Maryland appellate courts have examined whether the police had probable cause to make a warrantless entry into a unit in a multi-unit building, in a claimed exigency situation. In *Nilson v. State*, 272 Md. 179 (1974), three armed African-American males, wearing ski masks, robbed a bank of about $3,000, including $200 in "bait" money. The assistant bank manager gave the police detailed physical descriptions of the robbers.

13

Witnesses saw men matching the robbers' descriptions use and discard several vehicles in the process of getting away, and then board a bus and take a taxi to an area near Callow Avenue. The police found one of the getaway cars, determined that it had been stolen, and found inside it a one-hour dry cleaning ticket bearing the name "McCoy" and the address "2458 Callow." *Id*. at 181. They quickly responded to that address, which was a three-story, 15-unit apartment building, and saw another getaway car parked near the building. A records check revealed that that car was registered to apartment 12. The police learned from residents in the building that three African-American men were living in that apartment. The resident of apartment 10 told the police that the three men had left the apartment building at around 8:00 a.m., in the getaway car found nearby, and had returned at around 11:00 to 11:30 a.m. (The robbery was committed at 9:40 a.m.) A fourth man entered the apartment shortly thereafter.

At 12:45 p.m., a police officer knocked on the door to apartment 12. A man named Campbell answered, but refused to let the officer in without a warrant. While the officer was standing at the door, he heard noise coming from the back room. He pushed the door open and entered the apartment. Nilson and Campbell were arrested in the front area of the apartment. Three other men, including McCoy, were arrested in the rear area. Inside the apartment, in plain view, were weapons similar to those described as being used in the robbery. Some of the bait money was found on one of the men inside the apartment. The police proceeded to search the apartment. They seized two ski masks and a loaded revolver

14

from underneath a mattress in the rear bedroom, and a boot containing $970 from inside a cupboard in the middle bedroom.

After being charged in the robbery, Nilson moved to suppress all the evidence recovered from apartment 12. The trial court ruled that the warrantless entry was justified by exigent circumstances and denied the motion as to the weapons and bait money. (It granted the motion to suppress as to the ski masks, revolver, and the $970 in currency.) Nilson was convicted, and, ultimately, his case came before the Court of Appeals.

The Court rejected Nilson's argument that exigent circumstances did not exist because the police waited over an hour after they arrived at the apartment complex before attempting to enter apartment 12. The Court observed that "during much of this period the police were conducting an on-the-scene investigation at the apartment building, and were carefully assembling evidence of the probable involvement in the crime of the persons in apartment 12." *Id.* at 191. The Court affirmed, holding there were exigent circumstances that justified the warrantless entry into apartment 12 "upon probable cause." *Id.*

In *Dent v. State*, 33 Md. App. 547, 548 (1976), this Court held that the police did not have probable cause to support a warrantless entry into a residence to search for a crime suspect. Two men broke into a couple's house and robbed them at gunpoint, taking among other things an Admiral television set. From a photograph, the wife identified Dent as one of the robbers. In their haste, the robbers left several items at the couple's house, including a jacket in which there was a note bearing a woman's name, address, and telephone number.

15

The police contacted her and she told them she recently had met a man named Leon (Dent's first name) who was living at a particular address on Midwood Avenue, in Baltimore City. The police went to that address, which was a house in which there were at least two apartment units.

One officer knocked on the door of the second floor apartment. No one answered, but he heard a "scuffling" noise coming from inside. At that point, other officers told him that Dent had been apprehended and arrested outside, while he was trying to run away from the building. Thinking the second robber might be in the second floor apartment, the officer arranged for other officers to use a ladder from an emergency vehicle to climb in the apartment through an open window and unlock the door from inside. The officer entered and found no one in the apartment. He did find an Admiral television set, however. The officer applied for and obtained a search and seizure warrant for the second floor apartment, determined that the television set bore the serial number of the television stolen from the couple, and seized it.

On appeal after conviction, Dent argued that the original warrantless entry into the second floor apartment was illegal and the television set seized from the apartment pursuant to the later-issued warrant was tainted by the illegal entry and search. The State maintained that the entry was justified by exigent circumstances. We reversed, holding that the facts known to the police at the time of their warrantless entry into the second floor apartment did not constitute probable cause to believe that the second robber was inside that apartment:

> Only [Dent] had been tentatively identified as a participant in the robberies; the identity of the second robber was unknown; the information from the female

16

informant placed [Dent] in the house on Midwood Avenue, but there was no designation of the second floor apartment as being the apartment of [Dent]. [Dent] was arrested outside the house and there was no information at that time suggesting that he had been in the second floor apartment; there was no evidence that a second person was in the apartment other than a "scuffling noise" allegedly heard by [the police officer] and his own "feeling" that someone was there; there was no information to indicate that a second person, if present, was involved in the robberies committed more than 30 hours previously.

*Id.* at 555-56.

We further agreed with Dent that the fact that the television set was found inside the second floor apartment could not form a basis for the affidavit in support of the search warrant, because the television set was the fruit of the illegal search. Nor was there an independent source showing the presence of the television set in that apartment. Without the information about the television set, "no probable cause was stated which would justify the issuance of the warrant for the second floor apartment at this address." *Id.* at 557.

Several federal and out-of-state cases have addressed what constitutes probable cause for the police to search apartments and hotel rooms for a crime suspect. In *United States v. Scott*, 520 F.2d 697 (9th Cir. 1975), *cert. denied*, 423 U.S. 1056 (1976), four African-American males robbed a bank at gunpoint. They were seen speeding away from the bank in a car the police soon located. Tire marks nearby led police to conclude that the men had switched cars. Witnesses in the area described seeing a car traveling away from the area at a high rate of speed. They provided a description of the car and a partial license plate number. The second car was located in the parking lot of an apartment complex. It still was warm to the touch. There were 20 apartments in the complex. From information they already

17

knew and additional information they obtained from the apartment manager, the police figured out that seven of the apartments were leased to African-American males. They entered and searched six of those apartments, finding nothing. They knocked on the door of the last apartment of interest–apartment 7–but there was no response. They obtained the manager's pass key and gained entry. The defendants were found inside, as was evidence connecting them to the robbery. They were charged and convicted of bank robbery.

On appeal, a divided panel of the Ninth Circuit held that the district court properly denied a motion to suppress evidence found in apartment 7. All three panel members agreed that there were exigent circumstances.

> Had the officers delayed their entry to apartment 7 to secure a search warrant for that apartment, the suspects might well have escaped or concealed evidence, and the risk of armed confrontation would have been increased.

*Id.* at 700. They disagreed on the issue of probable cause to believe the suspects were inside apartment 7. The majority held that by focusing only on the seven apartments leased by African-Americans, and then eliminating six of them, the police came to have probable cause to believe the robbers were inside apartment 7:

> Accepting that pursuit here had brought the officers to the apartment house, this did not render each apartment in it subject to search. The occupants of each apartment had their independent right to be free from unreasonable search. No apartment was subject to entry in the absence of probable cause to believe that the robbers were present in that particular apartment.
>
> The question, then, is whether the officers at apartment 7 had, at the time of entry, probable cause to believe that the fugitives they sought were there; whether, with action frozen at that moment, a warrant could properly have been issued for search of the apartment. In our judgment it could. There was reasonable cause to believe that the fugitives had entered the apartment complex. There was knowledge that they were not present in 6 of the 7 units

18

most likely to be their objectives. Apartment 7 then remained as the most likely choice. There was cause to believe that it was occupied and that the occupant or occupants did not wish to admit their presence.

*Id.* (footnote omitted). In a footnote, the majority commented that the record did not reveal how the police had entered the other six apartments, but,

> even assuming impropriety, [the defendants] lack standing to complain of the intrusion. Such would have been the rule had incriminating evidence been seized [from the other apartments]. *See Brown v. United States*, 411 U.S. 223, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973). In our judgment no broader rule of standing should apply where violations of the rights of third parties merely contribute to the existence of probable cause.

*Id.*

> The dissenting judge took issue with this, observing that the majority was

> perhaps acting precipitously in assuming that the criteria used for determining standing to challenge an illegal seizure of goods also govern the standing to challenge a series of general searches without probable cause, the results of which are then used to find probable cause for arresting the one now making the challenge.

*Id*. at 703.

A little over a decade later, the Ninth Circuit decided *United States v. Winsor*, 846 F.2d 1569 (9th Cir. 1988) (*en banc*), which involved a systematic search of a multiple dwelling building, similar to the search in the case at bar. A bank robber fled the scene of the crime, with the police in pursuit. Officers saw him enter a two story residential hotel. They surrounded the hotel and obtained permission from the hotel manager to search for the suspect. One of the officers involved in the search had a surveillance photograph from a prior bank robbery, thought to have been committed by the same man, that showed the robber and an accomplice who was acting as a "look-out."

19

The police carried out a room-by-room search of the hotel. At each room, with guns drawn, they knocked on the door and announced, "Police. Open the door." After searching all the rooms on the first floor and some on the second floor (about 15 to 25 total), the police knocked on the door to room 213. The defendant's brother opened it. The police officer with the surveillance photo immediately recognized him as the robber and held him at gunpoint while the other officers entered the room and searched it. There, they found the defendant, who was the "look-out" in the surveillance photo, and evidence of the robbery.

Before trial, the defendant challenged, without success, the police entry into room 213, on Fourth Amendment grounds. He was convicted of possessing proceeds from a bank robbery. On appeal, a panel of the Ninth Circuit affirmed. It explained that "hot pursuit" alone could not justify the police entry into room 213 because, while "'[h]ot pursuit may excuse police from the Fourth Amendment's warrant requirement,'" it may not "'excuse the absence of the requisite degree of suspicion before effecting a search.'" *Id*. at 1571 (quoting *United States v. Winsor*, 816 F.2d 1394, 1396 (1987)). The government conceded that the police did not have probable cause to believe that the bank robbery suspect was inside room 213 when they entered that room. It argued, however, that the police had "reasonable suspicion . . . to believe that the suspect would be in . . . one of the rooms that had not yet been searched" and that reasonable suspicion (as opposed to probable cause), coupled with the "important law enforcement interests," outweighed the "minimal intrusion on [the defendant's] privacy rights." *Id*.

20

In a rehearing *en banc*, the Ninth Circuit disagreed. It held that to lawfully conduct a warrantless search of a dwelling based on exigent circumstances the police must have probable cause to believe the suspect is inside that dwelling; reasonable suspicion that the suspect is inside the dwelling is not enough. The *en banc* court concluded that the suppression motion should have been granted, and reversed the conviction.

In *Winsor*, the defendant lived in the hotel room that was illegally entered and searched. In *Fisher v. Volz,* 496 F.2d at 338, the Third Circuit held that exigency will not justify a warrantless police entry into the home of a third party to search for a crime suspect unless the police have "probable cause to believe that the named suspect is present within [the premises]." *Fisher* was a civil action for damages brought pursuant to 42 U.S.C. section 1983 by six African-American citizens of Newark, New Jersey. They alleged that the Newark Police Department ("NPD") had violated their Fourth Amendment rights by searching their homes without a warrant or probable cause in an effort to find suspects in a bank robbery.

Bernice Bass was one of the plaintiffs in *Fisher*. In the aftermath of the bank robbery, the FBI identified suspects and obtained arrest warrants for them. Five days after the robbery, during an interview at the home of the mother of one of the suspects, an FBI agent noticed a piece of paper with a phone number for another of the suspects. A check of that phone number linked it to an individual by the name of "B. Bass." Police investigated and determined that Bass previously had paid a bail bond for one of the suspects in an unrelated matter.

That afternoon, FBI agents and NPD officers went to an address identified for Bass and discovered that it was a six-story apartment house. The superintendent of the apartment house gave the officers a key to an apartment for "B. Bass." The police entered the apartment, searched for a few minutes, and, finding no one there, left. When Bass returned home, she learned from neighbors that the police had searched her apartment.

Bass's 1983 action against a particular detective in the NPD was tried to a jury, which returned a defense verdict. On appeal, Bass argued that the trial court improperly instructed the jurors that if they found exigent circumstances they could find that the police entry into her apartment was *not* unreasonable. She also argued that the court erred in instructing the jurors that they could consider eleven factors in deciding exigency, including whether the police had "strong reason to believe that the suspect was in the premises being entered." *Id*.

The Third Circuit reversed, holding that the jury instructions were legally incorrect because they permitted the jurors to "return a verdict against plaintiff Bass if [the jurors] found the existence of some of the factors enumerated by the trial court created 'exigent circumstances' which justified the entry into her apartment, even though there might not have been probable cause to enter." *Id*. The Court explained that "police officers may not constitutionally enter the home of an innocent citizen in search of a suspected offender for whom they have a valid arrest warrant, even under exigent circumstances, *unless they also have probable cause to believe that the suspect will be found on the premises*." *Id*. at 341-42 (emphasis added) (footnotes omitted).

In *Llaguno v. Mingey,* 763 F.2d at 1560, the Seventh Circuit held that the police must have probable cause to believe a suspect is inside the home of a third party before entering that home without a warrant, even when the exigency involved is a serious and imminent threat to public safety. There, police in Chicago were conducting a massive manhunt for a suspect who, along with an accomplice, had committed two robberies, killed four people, wounded three others (including a police officer), and abducted a young girl. The police captured the accomplice after he crashed his getaway car. That car was registered to Vilma Llaguno and had not been reported stolen. With this information, several police officers went to the Llaguno home armed with a shotgun and a sledgehammer. They did not have a warrant. They banged on the door and ordered the woman who responded, Gloria Llaguno, to open it. They ran inside with guns drawn and herded the ten occupants of the home into the living room. Gloria's son, David Llaguno, was arrested and held for more than 40 hours. No charges were filed against him. The person who actually committed the crimes later was shot and killed by the police. He was another of Gloria's sons, but did not live with her.

Gloria, David, and other residents of the Llaguno house brought a section 1983 action against the police officers who entered their home without a warrant. A jury returned a verdict in favor of the police officers and the plaintiffs appealed. In a rehearing *en banc*, the Seventh Circuit reversed and remanded on the ground of an improper jury instruction on probable cause. The court found that the danger to the public was so great as to have constituted exigent circumstances. In addition to exigency, however, the police had to have probable cause, *i.e.*, knowledge of facts giving rise to a reasonable belief that "the search of

*this* house [*i.e.*, the Llaguno house] would prove fruitful in the criminal investigation." *Id*. at 1565 (emphasis in original). "Emergency is not enough." *Id*. Even under these extreme circumstances, the police could not have "search[ed] every house in Chicago or even every house on the Llagunos' block." *Id*. The court concluded that the jury instruction on probable cause erroneously permitted the jurors to find that the warrantless entry into the Llaguno home was lawful without any consideration of whether the police reasonably should have "act[ed] so hastily on the basis of their very limited knowledge without investigating further." *Id*. at 1568.

In *Vasquez v. Snow*, 616 F.2d 217 (5th Cir. 1980), also a section 1983 case, an arrest warrant was issued for a robbery suspect the police knew only as "Sotelo." The police could not find Sotelo because he had "too many friends, and he was staying with all of them." *Id*. at 218. He moved from house to house, staying a night or two, at most, before moving on. During the investigation, a police detective received a tip that "Sotelo 'had been seen' with some frequency" at Vasquez's house and that he "'maybe . . . was staying there part of the time.'" *Id*. A few days later, several police officers conducted warrantless searches of three houses, without success. They then surrounded Bertha Vasquez's house, and an officer knocked on the door and identified himself. Vasquez's sister answered the door. The officer informed her that he had a warrant for Sotelo's arrest and believed that Sotelo was inside. She refused him entry. When the officer threatened to enter by force, she "capitulated" and let him inside. *Id*. at 219. The police searched the house for Sotelo, but did not find him.

Vasquez sued two of the police officers who searched her house, alleging that their

24

warrantless entry into her home violated her Fourth Amendment rights. The trial court granted summary judgment in favor of the officers, ruling, as pertinent, that the search was lawful.

The Fifth Circuit reversed. It explained that a police officer with an arrest warrant for a suspect may search the premises of a third party for the suspect if the police officer has a probable cause that the suspect is inside. Specifically, the officer must have "knowledge and trustworthy information [of the type that] would cause a man of reasonable caution to believe that the suspect" is in the particular place to be searched. *Id*. at 220.

The court held that the facts known to the police officer who knocked on Vasquez's door did not give rise to a reasonable belief that Sotelo was inside Vasquez's house. The court emphasized that Sotelo was evading arrest; had been moving from place to place; that the tip stated that Sotelo had been seen at the Vasquez house a few *days* prior to the search; and that there was "a substantial likelihood that [Sotelo] [was] at a location other than the target." *Id*. Characterizing the search of Vasquez's house as "at best a shot in the dark," *id*. at 219, the court pointed out that the conduct of the police on the same day, but before the search, showed that they simply were guessing as to where Sotelo would be found. Vasquez's house was the fourth one searched that day "sans search warrant." *Id*. "[The police] obviously thought that Sotelo might just as easily have been hiding in these other places." *Id*. "The fourth amendment plainly forbids such wholesale intrusions." *Id*.

No case better illustrates the perversity of "wholesale intrusions" than *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966). The searches in *Lankford* were the notorious "Veney

25

raids" in Baltimore City, which stemmed from an armed robbery of a liquor store committed by multiple men on Christmas Eve in 1964. One of the robbers shot and seriously wounded a police lieutenant. Several suspects immediately were identified and a widespread manhunt commenced. On Christmas Day, a police sergeant aiding in the search for the suspects was shot and killed. Several arrests were made, but the two primary suspects, brothers Samuel and Earl Veney, remained at large.

Arrest warrants issued for the Veney brothers charging them with the armed robbery and the shooting of the lieutenant. The BPD Commissioner authorized the formation of a special police squad to search for the Veney brothers. Over the next 19 days, the BPD received hundreds of unverified anonymous tips and, in reliance upon them, conducted "turn ups" of more than 300 houses. A "turn up" is "an investigation of a location and usually includes a search of the premises." *Id*. at 199. The police did not seek or obtain a search warrant for any of the premises. The searches proceeded as follows:

> A police emergency vehicle carrying shotguns, submachine guns, tear gas apparatus, and bulletproof vests accompanied the men on every search. Before each turn-up a surveillance team of plainclothesmen would drive past the building to locate exits, alleyways, etc., but there were no inquiries in the neighborhoods about the houses to be searched nor was there any other investigation of the tips, except to observe the character of the neighborhood.

> Four officers carrying shotguns or submachine guns and wearing bulletproof vests would go to the front door and knock. They would be accompanied or followed by supervising officers, a sergeant or lieutenant. Other men would surround the house, training their weapons on windows and doors. "As soon as an occupant opened the door, the first man would enter the house to look for any immediate danger, and the supervising officer would then talk to the person who had answered the door."

*Id*. (quoting *Lankford v. Schmidt*, 240 F.Supp. 550, 554 (D. Md. 1965)).

The plaintiffs in *Lankford* were four African-American families, on behalf of other similarly situated persons, whose homes were subjected to warrantless police searches during the Veney raids.[9] They brought a section 1983 action against the BPD Commissioner, seeking injunctive relief to prevent further warrantless intrusions. The Fourth Circuit held that the plaintiffs' homes had been searched without probable cause, in violation of the Fourth Amendment. It opined:

> This case reveals a series of the most flagrant invasions of privacy ever to come under the scrutiny of a federal court. The undisputed testimony indicates that the police in conducting the wholesale Veney raids were engaging in a practice which on a smaller scale has routinely attended efforts to apprehend persons accused of serious crime. . . . . The parties seeking redress have committed no acts warranting violation of the privacy of their homes; there has never been any suspicion concerning them or their associations.

*Id*. at 201-02. The court held that the plaintiffs were entitled to injunctive relief. It emphasized that every member of the BPD should be "familiar with the principle that if the police intend to conduct a search of a man's home for a suspect, they must at least have probable cause to believe that he is on the premises." *Id*. at 202-03.

---

[9]The Veney brothers were not found during the 19-day manhunt. In March of 1965, they were found working at a zipper factory in Long Island, New York. They were charged with numerous offenses, and the trials in their cases were removed to Frederick County. Samuel Veney was convicted of first degree murder and was sentenced to death. His sentence was commuted to life in prison in 1973, pursuant to *Furman v. Georgia*, 408 U.S. 238 (1972). In 1993, he briefly escaped from prison but was found and returned. He remains in prison. Earl Veney was convicted of armed robbery and was sentenced to 30 years' imprisonment. He was found hanged in prison in 1976. *See generally* David M. Ettlin & Michael James*, Murderer of Officer in '64 Flees While on Family Visit*, Balt. Sun, Apr. 21, 1993, at 1A; Joe Nawrozki, *Until Monday, 1964 Manhunt for Veneys was City's Largest*, Balt. Sun, Jan. 20, 1993, at 13A; *Veney v. State*, 251 Md. 182 (1968).

The court admonished the BPD that wholesale raids on the homes of African-Americans in poor neighborhoods would lead those citizens to believe, justifiably, that they were not entitled to the same protections as the rest of society; and that, in turn, would expose Baltimore City to the "agony and brutality of the riots" experienced in other large cities that Baltimore had "escaped thus far." *Id*. at 203. The court opined:

> The police department is society's instrumentality to maintain law and order, and to be fully effective it must have public confidence and cooperation. Confidence can exist only if it is generally recognized that the department uses its enforcement procedures with integrity and zeal, according to law and without resort to oppressive measures. Law observance by the police cannot be divorced from law enforcement. When official conduct feeds a sense of injustice, raises barriers between the department and segments of the community, and breeds disrespect for the law, the difficulties of law enforcement are multiplied.

*Id*. at 204 (footnote omitted).

We return to the case at bar. Under the holdings in the cases just discussed, even in the face of exigent circumstances the police could not enter Apartment J, without a warrant, to search for the suspects in the Vaughn Johnson shooting unless they had probable cause to believe that the suspects were in that apartment. To be sure, the police had knowledge of facts and circumstances that made it reasonable to believe that the suspects were inside an apartment in either building 5931 or 5933. That was not sufficient, however.[10]

As the holding and underlying facts in *Nilson* make clear, probable cause to believe that a suspect is inside a particular apartment unit in a multi-unit building need not be

---

[10] Of course, the police could have entered Apartment J or any of the other apartments with consent. Consent was not sought or given, however.

28

established by direct evidence, that is, evidence that the suspect was seen entering the apartment, either by the police or by a witness. Circumstantial evidence that eliminates other apartments and points strongly toward a suspect being present in a particular apartment is sufficient to generate probable cause.

Here, there was no direct evidence that the two suspects had entered Apartment J, nor was there circumstantial evidence, such as that gathered by the police in *Nilson*, connecting the suspects to Apartment J so as to make it probable that they were inside that particular apartment. As the holdings and underlying facts in *Dent*, *Winsor*, *Fisher*, *Llaguno, Vasquez*, and *Lankford* make clear, an educated guess or reasonable suspicion that a suspect is in one of two or one of several apartments in the same building, or in one of a series of houses in a given location, will not substitute for the probable cause necessary to search a particular apartment without a warrant, notwithstanding exigent circumstances.

We also are guided by federal and state cases that make clear that, had Officer Loiero applied for and *obtained* a search warrant to search for "Ty" and the shooter in buildings 5931 and 5933, the warrant would have been void for lack of particularity. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched*, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (footnote omitted). The general rule

29

is that a warrant to search a multi-unit building is void unless it specifies the unit to be searched. *See United States v. Hinton*, 219 F.2d 324 (7th Cir. 1955).[11]

Three cases decided by the Seventh Circuit under the particularity clause are instructive. In *Hinton*, 219 F.2d at 325, the police obtained a search warrant for "the basement and three floors" of a residential apartment building in Chicago. There was one apartment unit on each floor and one in the basement. An informant had told police that she had witnessed heroin being sold on the premises of the apartment building by four women, all of whom she knew by their aliases. The affidavit in support of the warrant application stated that one woman was known as Savannah White and another as Sue. The affidavit did not identify the four women as residents of the apartment building or otherwise identify any of the apartments as being the location of the heroin sales or the locus of any other illegal activity.

The police searched all four apartment units, seized narcotics evidence,[12] and arrested two women: Savannah Hinton and Susie Powers. Hinton and Powers were charged with federal narcotics crimes. They moved to suppress the evidence seized from the apartment building. The district court denied their motions and both were convicted.

On appeal, the Seventh Circuit reversed. It reasoned that although, ordinarily, the "showing of probable cause and the particularity of the description of the place to be

---

[11] That general rule does not apply, however, if "the defendant was in control of the whole premises or they were occupied in common[;] if the entire premises were suspect[;] or if the multiunit character of the premises was not known to the officers." *United States v. Gilman*, 684 F.2d 616, 618 (9th Cir. 1982). None of those exceptions apply here.

[12] The location of the seizure of the narcotics evidence is not clear.

30

searched" are separate issues, here, they were intertwined because the "scope of the warrant to search is dependent upon the extent of the showing of probable cause." *Id*. at 325. This was so because "[t]he command to search can never include more than is covered by the showing of probable cause to search." *Id*. The court concluded that the warrant was fatally deficient because the application failed to specify probable cause as to any particular apartment, much less all of them. The court emphasized that "searching two or more apartments in the same building is no different than searching two or more completely separate houses." *Id*. at 325-26.

Fifteen years later, the Seventh Circuit revisited this issue in *United States v. Higgins*, 428 F.2d 232 (7ᵗʰ Cir. 1970). There, the police received a tip from an informant that Higgins was selling heroin from a basement apartment in Chicago. The apartment building was three stories and had four apartments on each floor, plus three in the basement. The basement apartments were rented by Higgins, Morris Jones, and the Barfield family, respectively. The police obtained a search warrant for the entire basement of the apartment building. They went to the building and entered the Barfield apartment first. They asked Mr. Barfield if he knew a man named "Sonny" and then left. *Id*. at 234. Police then "kicked open" Jones's "partially closed" door and entered his apartment. *Id*. After searching for about five minutes, they left. Finally, police kicked in the door to Higgins's apartment, seized drug evidence, and arrested him.

Higgins moved to quash the affidavit for the search warrant and the search warrant itself and to suppress the evidence seized from his apartment. His motion initially was

denied, but on reconsideration was granted. The government took an interlocutory appeal and the Seventh Circuit affirmed. It held that the search warrant was deficient for lack of probable cause because the informant's tip was not sufficiently reliable and, as relevant here, the warrant did not "describe with particularity the place to be searched." *Id*. Relying on *Hinton*, the court reasoned that the police "could not determine from the warrant which apartment was to be searched and that they made that determination by searching all [three basement] apartments until they discovered the one they were looking for." *Id*. at 234-35.

Finally, in 1994, the Seventh Circuit decided *United States v. Johnson*, 26 F.3d 669 (7th Cir. 1994), *cert. denied*, 513 U.S. 940 (1994). There, five co-defendants were convicted of federal drug crimes. One co-defendant, Reginald Johnson, argued on appeal that a gun and cocaine seized from the bedroom and kitchen of his upstairs unit in a duplex should have been suppressed because the search warrant was overbroad. He relied primarily on *Hinton* and *Higgins*. The Seventh Circuit concluded that those cases were distinguishable and upheld the denial of the motion to suppress. It explained as follows the holding in *Hinton*:

> [T]he affiant (law enforcement officer) who sought the warrant in *Hinton*, did not have probable cause to search *any* particular apartment unit in the apartment building. He only knew that illegal activity was occurring somewhere in the four-floor, four-unit building, i.e., in one of the units. **Such a generalized search violated the Fourth Amendment because the officer was in effect playing a "shell game" searching for the one apartment out of four where the illegal activity was occurring.**

*Id*. at 692 (bolded emphasis added). Similarly, in *Higgins*, the warrant was overbroad because it did not specify which of the three basement apartments was the locus of the alleged drug activity.

32

In contrast, in *Johnson*, the police officer who swore out the affidavit in support of the search warrant had probable cause to believe that the upper *and* lower units of the duplex both were being used for illegal drug activity. On that basis, the court affirmed. In *United States v. Busk*, 693 F.2d 28 (3d Cir. 1982), the Third Circuit addressed the particularity requirement with respect to a warrant to search a multi-unit dwelling. The warrant authorized the search of 3123 Richmond Street, a property Busk was alleged to "own[], occup[y], or possess[]," for evidence of suspected illegal gambling activity. *Id*. at 29. That address was for a 3-story attached row house with three apartments, one on each floor. Each apartment had its own keyed lock and a separate doorbell outside the front door of the row house. The police had determined from gas and electric records that the apartment on the second floor was occupied by an associate of Busk. When police arrived to execute the warrant, they observed Busk leaving 3123 Richmond Street. They frisked him and found $16,000 and a set of keys on his person. They directed him to accompany them back to the apartment building. The police mistakenly entered 3119 Richmond Street, however, which also was a multi-unit dwelling. In that building, they searched the second and third floor apartments, but found no evidence of illegal gambling. At that point, the police realized they were in the wrong building and went to 3123 Richmond Street, where they entered the second floor apartment using Busk's keys, and seized gambling paraphernalia.

The Third Circuit held that the warrant was facially defective because it identified the entire premises of a multi-unit building even though there only was probable cause to search the apartment on the second floor. The court reasoned that the police plainly understood the

33

warrant to authorize them to search all three apartments, given that, when they mistakenly entered the building at 3119 Richmond Street, they searched the second floor *and* third floor apartments. On these bases, the court ruled that it was error to deny Busk's motion to suppress, and reversed his convictions and remanded for a new trial.[13]

As *Hinton*, *Higgins*, *Johnson*, and *Busk* make plain, the search of individual apartment units within a multi-unit apartment building is no different from the search of individual homes within a neighborhood or town. Probable cause to believe that the object of the search–here a suspected shooter and his accomplice–will be within a particular apartment unit is a necessary prerequisite to search that apartment absent consent. The generalized, though reasonable, belief that the target of a search is somewhere within a multi-unit building

---

[13] *See also United States v. Bedford*, 519 F.2d 650, 654-55 (3d Cir. 1975) (stating the general rule that a warrant "directed against an apartment house will usually be held invalid if it fails to describe the particular apartment to be searched with sufficient definiteness to preclude a search of other units located in the building and occupied by innocent persons," but holding that the warrant in that case identified the apartment of the defendant with sufficient particularity); *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) (reversing dismissal of section 1983 action and holding that police acted unreasonably and in violation of the Fourth Amendment if, when they discovered that a building named in an otherwise valid search warrant contained multiple units, they failed to cease the search to determine which apartment unit properly was the subject of the warrant); *United States v. Parmenter*, 531 F.Supp. 975 (D. Mass. 1982) (search warrant authorizing the search of an eight-apartment, three-story duplex void for lack of particularity where the police lacked probable cause as to all of the units); *State v. Jackson*, 756 N.W.2d 623 (Wis. App. 2008) (warrant authorizing search of a duplex was void because it did not specify probable cause to search a particular side of the duplex, nor did it state probable cause to search the entire building); *State v. Marshall*, 974 A.2d 1038 (N.J. 2009) (search warrant for a two-unit apartment building lacked sufficient particularity where affidavit made clear that police did not know in which of two units the asserted criminal activity took place).

34

does not give rise to probable cause to search every unit in the building. As the *Johnson* Court aptly stated, such a police tactic amounts to a "shell game."

In the case at bar, Officer Loiero and the other officers involved in the search did not have knowledge of facts giving rise to a reasonable belief that "Ty" and the shooter were inside Apartment J in building 5933. This would be true if it had been the first apartment searched and remained true when it was the third to last apartment searched. *See Vasquez, supra* (search of the fourth of four houses amounted to a "shot in the dark"). Even in *Scott, supra*, where the majority held that the search of the seventh of seven apartments was supported by probable cause because the other six apartments had been eliminated, the court implied that the search of the prior six apartments may not have been supported by probable cause. *See* 520 F.2d at 700 (noting that the probable cause inquiry turned on the police officers' reasonable belief at the time of the search of the seventh apartment, "with action frozen at that moment," and that the propriety of the prior six searches was not properly raised by the defendant).

There was no evidence before the circuit court that Officer Loiero or any other officer involved in the search made an attempt to investigate to determine which apartment the suspects had entered. They did not speak to residents of either building to learn whether they had seen two men matching the description of the suspects enter a particular building and a particular apartment. They did not investigate whether residents knew of a person named "Ty" who was connected to a particular apartment. They did not take steps to follow up on the information that Johnson provided them: that "Ty" lived on St. Regis Avenue, which was

35

just blocks away from the apartment complex. They did not contact apartment management, or any utility company, to try to ascertain whether a person named "Ty" was living in one of the buildings.

Instead of developing information by investigation, the police proceeded to search the apartments in buildings 5931 and 5933 one by one, for almost six hours, ordering occupants out of their homes at gunpoint, and opening apartment doors with a battering ram if necessary. All the apartment occupants were made to leave their homes and wait in a bus outside. Before the search of Apartment J in building 5933, the police had searched 21 apartments in this manner. The police only stopped when they happened upon an apartment with an occupant named "Ty."

The Fourth Amendment is designed to prevent such generalized, wholesale searches. *See Garrison*, 480 U.S. at 84 (in adopting the Fourth Amendment, the Framers intended to prevent "wide-ranging exploratory searches"); *Scott*, 520 F.2d at 703 (Ferguson, J., dissenting) ("The majority position puts this court in the position of condoning–or, at the least, relying upon–[general] searches of the very kind intended to be prohibited by the Fourth Amendment" to support a finding of probable cause); *Parmenter*, 531 F.Supp. at 982 (Fourth Amendment's particularity clause designed to prevent "unlawful intrusion by police officials into the homes of innocent persons"). The police lacked probable cause to believe that the suspects in this case were in any particular apartment in either building; and they did not obtain probable cause to believe that the suspects were in Apartment J at any time before they entered Apartment J without consent. The warrantless entry into 5933 Radecke Avenue,

36

Apartment J, without probable cause to believe the suspects were inside that apartment, was illegal under the Fourth Amendment.

**(C)**

Peters also contends the circuit court erred in its alternative ruling that the inevitable discovery doctrine applied. The State disagrees, and adds that the guns found in Apartment J were in plain view.

Under Fourth Amendment jurisprudence, "evidence seized during an unlawful search could not constitute proof against the victim of the search. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (internal citation omitted). "'Whether the exclusionary sanction is appropriately imposed in a particular case . . . is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."'" *Hudson v. Michigan*, 547 U.S. 586, 591-92 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984), in turn quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)) (alteration omitted). The Supreme Court has "'never held that evidence is "fruit of the poisonous tree" simply because "it would not have come to light but for the illegal actions of the police."'" *Id.* at 592 (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)).

Under the inevitable discovery doctrine, "evidence obtained after initial unlawful governmental activity will be purged of its taint if it was inevitable that the police would have discovered the evidence." *Miles v. State*, 365 Md. 488, 520-21 (2001) (citing *Nix v.*

37

*Williams*, 467 U.S. 431, 444 (1984)).  The inevitable discovery doctrine is an "exception [that] permits the government to cleanse the fruit of poison by demonstrating that the evidence acquired through improper exploitation would have been discovered by law enforcement officials by utilization of legal means independent of the improper method employed." *Stokes v. State*, 289 Md. 155, 162-63 (1980).  As the Court of Appeals explained in *Williams, supra*:

> In sum, the State has the burden of proving, by a preponderance of the evidence, that the evidence in question inevitably would have been found through lawful means.  This standard embodies two ideas – that there was a lawful method for acquiring the evidence and that the evidence inevitability *would* have been discovered.  When challenged evidence inevitably would have been discovered lawfully regardless of police misconduct, the deterrence effect of exclusion is minimal, and exclusion of the evidence would put police in a worse position than they would have been without any illegal conduct.  The inevitable discovery doctrine necessarily involves an analysis of *what would have happened* if a lawful investigation had proceeded, not what actually happened.  The analysis of what would have happened had a lawful search proceeded should focus on historical facts capable of easy verification, not on speculation.

372 Md. at 417-18 (citations omitted, emphasis in original); *see also Stokes*, 289 Md. at 166 (observing that the State must meet "the basic requirement . . . by competent evidence that there was a prescribed and utilized department procedure which would have, in fact, absent the [illegality] . . . uncovered the disputed evidence"); *Hatcher v. State*, 177 Md. App. 359, 397 (2007) ("The State must show, by a preponderance of the evidence, that the lawful means which made discovery inevitable were being actively pursued prior to the illegal conduct.").

38

Peters relies upon *Stokes*, *supra*, in arguing that the inevitable discovery doctrine did not apply. In that case, police executed a warrant to search the defendant's residence for controlled dangerous substances.

> Following an unsuccessful exploration lasting about five minutes, the officers terminated their quest, turned to Stokes and informed him "that if he would produce the narcotics, his wife would not be arrested." As a result of this assurance, [Stokes] revealed to the officers that drugs were hidden in a "drop ceiling" on the left side of the room. The officers then seized the contraband, heroin, and charged Stokes with its possession.

289 Md. at 157 (footnote omitted).

The Court of Appeals held that Stokes's statement was involuntary because it was "induced by [an] official promise which redounds to the benefit or desire of the defendant[,]" and therefore the search was improper. *Id.* at 160. It rejected the State's inevitable discovery argument because "the State ha[d] failed to meet even the most minimal requirements of [the inevitable discovery] doctrine." *Id.* at 165. According to the Court, "the prosecution, seeking to invoke inevitable discovery, bears the burden of establishing the admissibility of otherwise tainted evidence [and] the [S]tate's attorney here made no effort in the trial court to demonstrate compliance with either prerequisite to admissibility under this exception to the exclusionary rule." *Id.* (citation omitted). Although "the State avow[ed] . . . that the police, absent Stokes' statement, 'would' have searched the ceiling above petitioner's bedroom," the Court found that the State's "unsupported assertion" was "no substitute for evidentiary proof." *Id.*

In the case at bar, the guns and ski mask were found in the vent during the initial, unlawful, search of Apartment J. The police applied for a search warrant *after* the guns and

39

mask were found in the vent, and there was no evidence that they were in the process of applying for a warrant at or near the time of discovery. *See United States v. Antone*, 479 F. Supp. 2d 255, 267 n.11 (D.R.I. 2007) ("The government concedes that the inevitable discovery doctrine would not apply if the entry were unlawful because there is no evidence that the . . . police would have sought a warrant without the knowledge gained from the entry"); *see also Davis v. State*, 422 S.E.2d 546, 551 (Ga. 1992) (rejecting inevitable discovery when there was no evidence that the State would have applied for a search warrant based on a tip from a 10-year-old child that drugs were in the house).

Of course, a search warrant was issued in this case and was executed. The affidavit in support of the warrant application listed the discovery of the handguns in support. There is precedent that "[t]ainted information in a warrant affidavit does not vitiate an otherwise valid warrant issued upon probable cause set out in an affidavit." *Williams*, 372 Md. at 419. Yet, without the facts asserted about the guns, there was not probable cause to support the issuance of a search warrant at all, for the reasons we have explained. We are unable to conclude that the evidence in question would have been inevitably discovered but for the illegal entry into Apartment J. Thus, the motions court erred in denying the motion to suppress the guns and the mask seized from the vent in the bathroom in Apartment J based on the inevitable discovery doctrine.

Finally, there is no merit to the State's plain view doctrine argument. That doctrine is an exception to the warrant requirement that permits a police officer to seize an item in plain view when the officer has probable cause to believe that the item is contraband or

40

evidence of a crime. *See Horton v. California,* 496 U.S. 128, 133-37 (1990); *Arizona v. Hicks*, 480 U.S. 321 (1987) (holding that, when warrantless entry into apartment to search for shooter was justified based on exigent circumstances, seizure of stereo equipment in plain view in the apartment was illegal because police did not have probable cause to believe the stereo equipment was evidence of a crime). Significantly, however, the plain view doctrine only will apply if the officer "ha[s] not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." *Kentucky v. King*, 131 S. Ct. at 1858. *See also Sinclair v. State*, __ Md. __, No. 43, slip op at 29, Sept. Term 2014 (filed July 27, 2015); *Wengert v. State*, 364 Md. 76, 88-89 (2001); *Dent*, 33 Md. App. at 557 (holding that the plain view doctrine only applies when "the observation made by police (is) the result of a prior valid intrusion and the discovery of the evidence in plain view [is] inadvertent").

It is debatable whether the guns and ski mask were in plain view. Even if they were, the plain view exception does not apply, because the police entry into Apartment J was not legal.

## II.

Peters contends the evidence was legally insufficient to support his conviction for attempted armed robbery. Specifically, he argues that there was no evidence that he intended to steal from Johnson. The State responds that this issue is not preserved for review and lacks merit in any event.

Under Rule 4-324(a), a criminal defendant who moves for judgment of acquittal must "'state with particularity all reasons why the motion should be granted' and is not entitled to

appellate review of reasons stated for the first time on appeal." *Starr v. State*, 405 Md. 293, 302 (2008) (quoting Md. Rule 4-324(a)). "The language of the rule is mandatory, and review of a claim of insufficiency is available only for the reasons given by [the defendant] in his motion for judgment of acquittal." *Whiting v. State*, 160 Md. App. 285, 308 (2004) (citations omitted). Choosing to "submit" without articulating reasons to support acquittal is a waiver of any appellate challenge to the sufficiency of the evidence. *Garrison v. State*, 88 Md. App. 475, 478 (1991).

Here, at the conclusion of the State's case-in-chief, Peters moved for judgment of acquittal on the charge of attempted first degree murder. He did not address the attempted robbery with a dangerous weapon charge. After the court denied the motion, the defense rested its case without calling any witnesses. Then, at the close of all the evidence, Peters simply renewed his earlier motion, without additional argument, and that motion was denied. Because Peters did not move for judgment of acquittal on the ground that the evidence was legally insufficient to show that he had the requisite intent to steal, that issue is not preserved for review on appeal.

We agree with the State that the issue lacks merit in any event. The standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord State v. Smith*, 374 Md. 527, 533 (2003); "*[A]ll of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in

42

original, footnote omitted); *accord Bible v. State*, 411 Md. 138, 156 (2009). This standard gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. Further, "[a] valid conviction may be based solely on circumstantial evidence." *Smith*, 374 Md. at 534. Additionally, "[w]eighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *Id.* at 533-34; *see also Bible*, 411 Md. at 156 (stating "[the appellate court] must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference" (citation omitted)); *Sifrit v. State*, 383 Md. 116, 135 (2004) (the jury is "free to believe some, all, or none of the evidence presented").

"An attempt to commit a crime is, in itself, a crime. A person is guilty of an attempt when, with intent to commit a crime, he engages in conduct which constitutes a substantial step toward the commission of that crime." *Townes v. State*, 314 Md. 71, 75 (1988) (citing *Cox v. State*, 311 Md. 326, 329-31 (1988), and *Young v. State*, 303 Md. 298, 311 (1985)). "Robbery in Maryland is governed by a common law standard." *Spencer v. State*, 422 Md. 422, 428 (2011). Its judicially determined meaning is "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence, or by putting him in fear." *Coles v. State*, 374 Md. 114, 123 (2003) (citation omitted). "'The crime . . . however, is not committed unless there is an intention to deprive the owner

43

permanently of his property or the property of another lawfully in his possession.'" *State v. Gover*, 267 Md. 602, 606 (1973) (quoting *Hadder v. State*, 238 Md. 341, 354 (1965)).

The evidence adduced at trial, viewed most favorably to the State, showed that, on the night in question, Johnson was entering his apartment when he encountered the appellant and a person named "Ty." Johnson knew Ty because he had sold him marijuana. Ty asked Johnson whether he was "good," which Johnson understood to mean whether he had marijuana on his person. In fact, Johnson had two or three $20 bags of marijuana in his possession at the time. Johnson responded to Ty's question by saying, "yeah" and "[l]ike you already know," indicating that he did have marijuana in his possession. At that point, Peters pulled out two guns. Johnson testified that he thought that Peters and Ty were trying to rob him of marijuana and/or money. He attempted to flee, but Peters shot him.

From this evidence, reasonable jurors reasonably could infer that Peters and Ty were attempting to rob Johnson at gunpoint and that each of them had the requisite intent to permanently deprive him of his marijuana, his money, or both. Accordingly, the evidence was legally sufficient to support the conviction for attempted armed robbery.

**III.**

Finally, Peters contends the circuit court erred by denying his motions to dismiss based on violation of the 180-day *Hicks* rule and on the denial of his constitutional right to speedy trial.[14]

---

[14] *State v. Hicks*, 285 Md. 310 (1979); *see also* Md. Rule 4-271; Md. Code (2001, 2008 Repl. Vol.), § 6-103 of the Criminal Procedure ("CP") Article.

44

The record establishes the following chronology:

January 27, 2012        Arrest.

February 24, 2012        Indictment for Attempted First Degree Murder and related charges.

March 27, 2012        Defense counsel enters appearance.

March 27, 2012        Defense files omnibus motion requesting speedy trial.

April 13, 2012        Arraignment.

June 6, 2012        First Trial Date - State requests postponement because prosecutor is in another trial. Defense objects and demands speedy trial. Court postpones trial.

August 1, 2012        Second Trial Date - State requests postponement because DNA evidence is not available. (Although test results are complete, the results were being reviewed.) Court finds good cause to postpone the trial beyond *Hicks* date.

September 24, 2012        *Hicks* date.

September 25, 2012        Third Trial Date - State requests postponement because DNA evidence was not complete. (Although test results were complete, the results still were being reviewed.) Defense objects. Court postpones the trial, noting that defense will need adequate time to review and analyze evidence.

November 27, 2012        Fourth Trial Date - State requests postponement because prosecutor is in another trial. Defense objects, and notes it still has not received DNA report. Defense moves to dismiss for failure to grant a speedy trial. Court denies motion and postpones trial.

January 8, 2013        State supplements discovery with CD-R containing DNA results; CD-R containing Baltimore Police Standard Operating Procedures re DNA; identification of two related expert witnesses.

45

| February 6, 2013 | Fifth Trial Date - State requests postponement because prosecutor is unavailable due to death in family. Defense objects, notes that DNA results were not received in a timely fashion, and demands speedy trial. Court postpones trial, noting both that discovery was just provided by the State and the prosecutor is unavailable. |
| --- | --- |
| April 11, 2013 | Sixth Trial Date - State requests postponement because: (a) new prosecutor assigned to the case and not prepared for trial; and, (b) witness unavailable. Defense objects and demands a speedy trial. Court finds good cause to postpone trial because prosecutor needs additional time, and not because of witness unavailability. |
| June 11, 2013 | Seventh Trial Date - State requests postponement because prosecutor is in another trial. Defense objects and demands speedy trial. Court postpones trial. |
| August 19, 2013 | Court hears and denies Motion to Dismiss for Lack of Speedy Trial. Jury Trial commences. |

**(A)**

Pursuant to Md. Code (2001, 2008 Repl. Vol.), section 6-103(a) of the Criminal Procedure Article ("CP"), and Rule 4-271(a)(1), "the trial in a circuit court criminal prosecution must begin no later than 180 days after the earlier of (1) the entry of the appearance of the defendant's counsel or (2) the first appearance of the defendant before the circuit court." *State v. Huntley*, 411 Md. 288, 290 (2009); *accord Choate v. State*, 214 Md. App. 118, 139, *cert. denied*, 436 Md. 328 (2013). However, "[o]n motion of a party, or on the court's initiative, and for good cause shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date." Md. Rule 4-271(a)(1). "[A] determination of what constitutes good cause is dependent upon the facts and

46

circumstances of each case as the administrative judge, in the exercise of his discretion, finds them to be." *State v. Toney*, 315 Md. 122, 132 (1989) (footnote omitted).

In *State v. Brown*, 355 Md. 89 (1999), the Court of Appeals explained:

[T]he critical postponement for purposes of Rule 4-271 is the one that carries the case beyond the 180 day deadline [the *Hicks* date]. It is that postponement to which a reviewing court looks, and, when deciding whether to dismiss a case for inordinate delay, it is the length of the delay between the postponed trial date and the rescheduled date that is significant.

*Id.* at 108-09.

In this case, the *Hicks* date was September 24, 2012. The critical postponement that took the case beyond that date was granted on August 1, 2012. Trial was rescheduled for September 25, 2012. The stated reason for that postponement was that the DNA results still were under review. The administrative court found good cause to postpone the case for this reason. The motions court agreed, observing that the administrative judge "has wide latitude and he found that there was good cause to postpone the case to get the DNA evidence . . . ."

The administrative court did not abuse its discretion in postponing the trial beyond the *Hicks* date. It rationally could find that awaiting the results of DNA testing in this attempted murder case amounted to good cause. *See, e.g., Choate*, 214 Md. App. at 139-40 (holding that there was no abuse of discretion in granting a postponement under *Hicks* when a DNA expert and the prosecutor both were unavailable). And, where there was no inordinate delay in rescheduling the trial, the motions court properly denied the motion to dismiss for an alleged *Hicks* violation.

**(B)**

The Sixth Amendment to the United States Constitution, and Article 21 of the Maryland Declaration of Rights, guarantee a criminal defendant the right to a speedy trial. In assessing whether a defendant was denied this constitutional right, we make our own independent examination of the record. *Glover v. State*, 368 Md. 211, 220 (2002); *accord Howard v. State*, 440 Md. 427, 446-47 (2014). We defer to the circuit court's first-level findings of fact, unless clearly erroneous. Our constitutional appraisal is *de novo*, and is conducted "in light of the particular facts of the case at hand." *Glover*, 368 Md. at 221. Appellate review "should be 'practical, not illusionary, realistic, not theoretical, and tightly prescribed, not reaching beyond the peculiar facts of the particular case.'" *Brown v. State*, 153 Md. App. 544, 556 (2003) (quoting *State v. Bailey*, 319 Md. 392, 415 (1990)).

A claim of a Sixth Amendment speedy trial violation is assessed under the balancing test announced in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *See State v. Kanneh*, 403 Md. 678, 687 (2008). In *Barker*, the Supreme Court "rejected a bright-line rule to determine whether a defendant's right to a speedy trial had been violated, and instead adopted 'a balancing test, in which the conduct of both the prosecution and the defendant are weighed.'" *Kanneh*, 403 Md. at 687-88 (quoting *Barker*, 407 U.S. at 530). Four factors are to be assessed in determining whether a defendant's right to a speedy trial has been violated: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 688. "None of these factors are '"either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they

48

are related factors and must be considered together with such other circumstances as may be relevant.'"" *Id.* (quoting *Bailey*, 319 Md. at 413-14, in turn quoting *Barker*, 407 U.S. at 533).

1) Length of delay

"[T]he length of the delay, is a 'double enquiry,' because a delay of sufficient length is first required to trigger a speedy trial analysis, and the length of the delay is then considered as one of the factors within that analysis." *Kanneh*, 403 Md. at 688. "For speedy trial purposes the length of delay is measured from the date of arrest or filing of indictment, information, or other formal charges to the date of trial." *Divver v. State*, 356 Md. 379, 388-89 (1999).

Here, Peters was arrested on January 27, 2012, and was tried on August 19, 2013, approximately 19 months later. The circuit court observed that the delay was

> very troubling but the reality in Baltimore City is that people wait for their trial upwards to two or three years which is shameful in this Court's view but that's the reality. So I don't think a 16 month delay in Baltimore City would weigh against or in favor of either party, it's sort of a sad statement on the condition of the criminal justice system, but it is the reality and it's on the short side of the reality.

The delay was of a constitutional dimension. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (delays approaching one year are often deemed "presumptively prejudicial"). However, the length of delay that can be tolerated depends, to some extent, on the crime charged. *Barker*, 407 U.S. at 531 (explaining that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge"). For example, in *Divver*, the Court of Appeals found that a delay of 12 months and 16 days for a charge of driving under the influence of alcohol was "of uniquely inordinate

49

length for a relatively run-of-the-mill District Court case" that "presented little, if any, complexity" because the sole witness for the State was a police officer and the sole witness for the defense was the accused. 356 Md. at 390-391. In contrast, in *Glover*, the Court found that a delay of 14 months "was not an inordinate delay for a murder case involving complex DNA evidence." 368 Md. at 224. *See also Bailey*, 319 Md. at 411 (drug charges, independent of the other factors, did not justify a two- year delay); *Kanneh*, 403 Md. at 689 (complex child abuse case involving the presentation of DNA evidence may allow for a lengthier period of delay).

The case at bar was not "run-of-the-mill." *Divver*, 356 Md. at 390. There were numerous charges arising out of the shooting of Johnson, including attempted murder, and there was crucial evidence that needed to be tested for the presence of DNA. Under the circumstances, a 19-month delay was not inordinate. *Cf. Barker*, 407 U.S. at 516-18, 533-36 (concluding that a delay in excess of five (5) years did not violate Sixth Amendment speedy trial right).

2) Reasons for delay

All reasons for delay are not considered the same. Some carry greater weight than others:

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed more heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

50

*Barker*, 407 U.S. at 531 (footnote omitted); *see also Doggett*, 505 U.S. at 652 (according "considerable deference" to trial court's findings regarding reasons for delay).

The initial delay from Peters's arrest on January 27, 2012, until the first trial date, on June 6, 2012, or 4 months and 10 days, is regarded as necessary for pretrial preparation and will be accorded neutral status. *See Howell v. State*, 87 Md. App. 57, 82 (1991) ("[t]he span of time from charging to the first scheduled trial date is necessary for the orderly administration of justice, and is accorded neutral status").

The next delay, from June 6, 2012, until August 1, 2012 (1 month and 26 days) was due to the prosecutor's being unavailable, as he was in another trial. The Supreme Court has observed:

> Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated but, as we noted in *Barker v. Wingo*, 407 U.S. 514, 531 (1972), they must
>
> > nevertheless . . . be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

*Strunk v. United States*, 412 U.S. 434, 436 (1973); *see also Wilson v. State*, 281 Md. 640, 654 (1978) (concluding that delays caused by crowded court dockets and understaffed prosecutors are chargeable to the State, but are weighed less heavily than intentional delay); *Henry v. State*, 204 Md. App. 509, 551 (2012) (observing that the lack of availability of the prosecutor is chargeable to the State, but is weighed less heavily than an intentional delay).

51

The next delay(s), from August 1, 2012, until September 25, 2012, and again until November 27, 2012, totaling 3 months and 19 days, was due to the unavailability of DNA evidence. More specifically, although the DNA tests had been completed, the results still were under review.

In *Glover*, the Court of Appeals explained that "DNA evidence is highly technical, often requiring courts to allow more time for completion of the tests and review, by both parties, of the results. This is not to say, however, that we will permit the State to act in a lackadaisical fashion." 368 Md. at 226. The Court concluded that, "while minor delays in obtaining DNA evidence will not be weighed heavily against the State, nor against a defendant seeking his or her own DNA analysis, delays likely will not be tolerated upon clear demonstrations of a failure to monitor or aggressively pursue the attainment of these results." *Id.* at 227. When "a postponement is the result of the unavailability of DNA evidence, and there is no evidence that the State failed to act in a diligent manner, the grounds for postponement are essentially neutral and justified." *Kanneh*, 403 Md. at 690 (citing *Glover*, 368 Md. at 226); *accord Howard*, 440 Md. at 448-49. Accordingly, the delays caused by the unavailability of the DNA test results and by the DNA test results being under review is attributable to the State but does not weigh heavily in our analysis of Peters's speedy trial claim.

Thereafter, trial was postponed from November 27, 2012, until February 6, 2013, once again because the prosecutor was in another trial. Ordinarily, prosecutors are not treated as

interchangeable; therefore, we are persuaded that this two month and ten day delay, charged to the State, does not weigh heavily in the speedy trial analysis.

The two month and five day delay from February 6, 2013, until April 11, 2013, because the prosecutor was unavailable due to a death in the family, also weighs against the State, but not heavily. Likewise, the delays from April 11, 2013, to June 11, 2013, and June 11, 2013, to the actual trial date on August 19, 2013, which were due to a new prosecutor being assigned to the case, and that prosecutor's later unavailability because he was in another trial, do not weigh heavily against the State. Another reason cited for the April 11, 2013 postponement was that a witness for the State was not available. *See Howard*, 440 Md. at 448 (a missing witness justifies an appropriate delay). Thus, these delays of two months, and two months and eight days, do not weigh heavily in our analysis.

3) Assertion of right

The third *Barker* factor concerns the "defendant's responsibility to assert his right." *Barker*, 407 U.S. at 531. This factor is "closely related" to the other three, and "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id*. at 531-32. In the case at bar, Peters consistently asserted his right to a speedy trial. This factor weighs in his favor.

4) Prejudice

Finally, the most important factor in the *Barker* analysis is whether the defendant has suffered actual prejudice. *Henry*, 204 Md. App. at 554. The *Barker* Court identified three interests to be protected:

(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Barker*, 407 U.S. at 532 (footnote omitted).

Here, during argument on the motion to dismiss, Peters informed the court that he had been held without bail at the Baltimore City Detention Center, that he had lost touch with his family and believed they had been evicted from their home, and that he had lost his job.

Additionally, the court heard from the State that DNA was tested on the two firearms and the black ski mask. There was no DNA recovered from one firearm and the DNA from another firearm was inconclusive. The DNA recovered from the ski mask was positive as to Peters, however. Based, in part, on this proffer, as well as defense counsel's suggestion that Peters suffered actual prejudice awaiting trial, the court observed as follows:

> With regard to actual prejudice, I have not heard other than the prejudice of being locked up pre-trial which creates a certain amount of anxiety in the defendant, in fact it appears that the State's pursuit of the DNA evidence may have in some small way served to weaken the State's case and strengthen the defense's case, although I understand [defense counsel's] comments that he doesn't feel that it strengthened his case in any way.

> But on balance, I believe the factors weigh against granting the motion so I will deny the motion to dismiss for lack of speedy trial.

We are unable to conclude that in this Baltimore City attempted murder case Peters suffered actual prejudice because his trial did not take place until approximately 19 months after he was arrested.

Balancing

The specific facts of each case will determine the balancing of the four factors. *Glover*, 368 Md. at 231. As the Court of Appeals has explained, "we are mindful that our task is to ensure that the petitioner's right to a speedy trial has not been violated; we are also mindful, however, that delay is often the result of efforts to ensure the highest qualify of fairness during a trial." *Id.* at 231-32. Under the circumstances here, upon assessing and balancing the *Barker* factors, we are persuaded that Peters's constitutional speedy trial right was not violated. Accordingly, the circuit court properly denied the motion to dismiss.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY THE APPELLANT AND ONE-HALF BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**